**CHASE HOME FINANCE, L.L.C., Appellant,**

v.

**CAL WESTERN RECONVEYANCE CORPORATION and Real Time Resolutions, Inc., Appellees.**

**No. 14–08–00115–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 25, 2010.

Paul J. McConnell, III, Ben A. Baring, Jr., Houston, for appellant.

Gregory A. Thompson, Houston, for appellees.

Panel consists of Justices YATES and FROST and Senior Justice SEARS.*

* Senior Justice Ross A. Sears sitting by assignment.

## OPINION

KEM THOMPSON FROST, Justice.

The main issue in this case is whether, under the doctrine of subrogation, appellant Chase Home Finance, L.L.C., as servicing agent for HSBC Bank USA, N.A., trustee, should be subrogated to the rights of the holder of a prior, superior lien. If subrogation is allowed, then Chase's lien would be superior to the lien of appellee Real Time Resolutions, Inc., acting on behalf of RTR Properties, L.L.C., and the foreclosure of Chase's lien would cut off Real Time's lien. After a bench trial, the trial court concluded that allowing subrogation would cause material prejudice to Real Time and on this basis declined to grant subrogation. Applying a prior precedent from this court to the facts of this case, we conclude that as a matter of law Real Time would not be prejudiced by granting subrogation to Chase. Therefore, the trial court erred by not granting Chase subrogation as a matter of law. Accordingly, we reverse the trial court's judgment and remand to the trial court for a determination as to the amount of attorney's fees, if any, that should be awarded and for rendition of a declaratory judgment in Chase's favor.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In December 2003, William and Suzanne Hughes sold lot 63 in a subdivision on Tiki Island, Galveston County, Texas ("Property") to Loyd Dickerson. Aames Funding Corporation d/b/a Aames Home Loan ("Aames") loaned Dickerson the money for this purchase. Dickerson signed two purchase-money promissory notes in favor of Aames—a $300,000 note ("Dickerson Note 1") secured by a first deed-of-trust lien ("Dickerson Lien 1") and a $75,000 note ("Dickerson Note 2") secured by a second deed-of-trust lien ("Dickerson Lien 2"). The deed and deeds of trust were recorded in the Galveston County real property records in January 2004. The Dickerson notes and the liens securing them were later assigned to Wells Fargo Bank, N.A. ("Wells Fargo").

Less than a month after buying the Property, Dickerson signed a warranty deed conveying the Property to Ruth Gooch. This deed was recorded in the Galveston County real property records in August 2004; however, the Dickerson liens were not discharged as part of this transaction.

Gooch filed for bankruptcy protection, and later, in November 2004, she sold the Property to Mario Landin. In the contract between Gooch and Landin, the parties agreed that the existing liens on the Property would be released at or before closing. People's Choice Home Loan, Inc. ("People's Choice") advanced Landin the money for this purchase. According to documents from this transaction, Stewart Title Company ("Stewart Title") served as settlement agent for the closing. Landin signed two purchase-money promissory notes in favor of People's Choice—a $341,600 note ("Landin Note 1") secured by a first deed-of-trust lien ("Landin Lien 1") and an $85,400 note secured by a second deed-of-trust lien ("Landin Lien 2"). The deeds of trust were recorded in the Galveston County real property records in February 2005. The deed of trust that created Landin Lien 1 contains a provision stating that the lender will be subrogated to any and all rights, superior titles, liens, and equities of any owner or holder of an outstanding lien and debt whose lien is paid off using the proceeds of Landin Note 1, even if the holder releases the lien upon receiving payment.

A check in the amount of $348,482.63, the full pay-off amount of Dickerson Note 1, was cashed in December 2004. Aames's

successor, Wells Fargo, signed a release of lien as to Dickerson Lien 1 in December 2005, and this release was recorded in the Galveston County real property records in January 2006. Dickerson Lien 2 was not listed as an exception in the title policy issued for this transaction. After Dickerson Note 1 was paid off and other closing items were paid, there remained $57,471.71, which the title company paid to Gooch. Dickerson Note 2 was not paid off, and Wells Fargo did not release Dickerson Lien 2.

Effective June 2006, Landin Lien 1 and the note that it secured were assigned to HSBC Bank USA, N.A., trustee ("HSBC"). Chase Home Finance, L.L.C. is the servicing agent for HSBC.

HSBC foreclosed on Landin Lien 1, and, on August 1, 2006, HSBC purchased the Property at the foreclosure sale for $361,883.07, and the substitute trustee conveyed the Property to HSBC.

After this foreclosure, Dickerson Note 2 and Dickerson Lien 2 were assigned to RTR Properties, L.L.C., a company for whom Real Time Resolutions, Inc. acts as the loan servicer. In December 2006, Real Time Resolutions, Inc., acting on behalf of RTR Properties, L.L.C. (hereinafter "Real Time"), appointed a substitute trustee under the deed of trust for Dickerson Lien 2. Real Time then posted the Property for an April 2007 foreclosure sale.

Appellant/plaintiff Chase Home Finance, L.L.C. as servicing agent for HSBC ("Chase") filed suit in the trial court to prevent appellee/defendant Real Time from foreclosing on Dickerson Lien 2.[1] Chase obtained a temporary injunction preventing Real Time from foreclosing on this lien. Chase asserted that, because the

proceeds from Landin Note 1 were used to pay off Dickerson Note 1, the holder of Landin Lien 1 is subrogated to the rights of the holder of Dickerson Lien 1. Chase claimed that, because its lien was superior to Dickerson Lien 2 under the doctrine of subrogation, the foreclosure of this superior lien in August 2006 extinguished Dickerson Lien 2. Chase asserted a slander-of-title claim and sought to quiet title and obtain a declaratory judgment that its lien is superior to Dickerson Lien 2 and that the Property is not encumbered by any lien in favor of Real Time. Chase sought attorney's fees under the Declaratory Judgments Act.

Real Time counterclaimed asserting that the Dickerson Lien 2 is superior to Chase's lien and that Chase should not be subrogated to the rights of the holder of Dickerson Lien 1 because it would be inequitable to allow subrogation in this case. Alternatively, Real Time asserted that it was entitled to certain amounts as excess proceeds from the foreclosure sale.

Following a bench trial, the trial court granted judgment in favor of Real Time, ordering that Chase take nothing and declaring that Dickerson Lien 2 still encumbers the Property and has priority status over any lien or interest of Chase. The trial court awarded Real Time attorney's fees but did not award any actual damages to Real Time.

The trial court issued findings of fact and conclusions of law, in which the trial court found the following:

- Chase asserts that the Landin Lien 1 entitles Chase to the same treatment as if Chase were the holder of the Dickerson Lien 1 based on the doctrine of equitable subrogation.

---

1. Chase also sued appellee/defendant Cal Western Reconveyance Corporation, another servicing agent.

- In determining the proper application of the equitable-subrogation doctrine, the trial court considered the facts and equities of this case.
- The trial court considered various factors listed in its findings.
- The factors listed by the trial court showed that, if Chase were allowed to invoke the equitable-subrogation doctrine in this case, Real Time would be materially prejudiced.

The trial court concluded that Real Time was entitled to retain the Dickerson Lien 2 and that this lien encumbers the Property and takes priority over any lien held by Chase. The trial court relied on the principle that a junior lienholder should not be granted subrogation if the superior or equal equities of others with recorded interests would be prejudiced thereby. The trial court concluded that Real Time was entitled to reasonable and necessary attorney's fees under the Declaratory Judgments Act.

## II. ISSUES PRESENTED

On appeal, Chase argues that the trial court misapplied the law relating to subrogation and asserts that the evidence is legally and factually insufficient to support the trial court's fact findings.

## III. STANDARD OF REVIEW

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex.2005). We must credit favorable evidence if a

reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

## IV. ANALYSIS

### A. Trial Court's Findings Regarding Reasons for Denying Subrogation

Chase cites several cases and argues that, under equitable-subrogation law, Chase is entitled to subrogation as a matter of law, regardless of the factors cited by the trial court.[2] The trial court determined that Chase is not entitled to subrogation because subrogation would result in material prejudice to Real Time. The trial court found that material prejudice would result based on the following factors:

11.1 If the equitable subrogation doctrine were applied in this case, rather than being subordinated to a first lien loan with a fixed interest rate, [Real Time] would be subordinated to the materially less favorable interest rate of [Landin Lien 1], which was a variable rate subject to probable exponential increase in the rate. [Landin Note 1] would call for over $100,000.00 in additional interest. This would create a material prejudice to [Real Time] if the equitable subrogation doctrine were applied in this case.

11.2 At the time of and in connection with the transaction which is the

**2.** Chase also asserts that, under *Fortis Benefits v. Cantu,* the presence of the subrogation language in Landin Lien 1 entitles Chase to contractual subrogation without any consideration of the equities, and that the trial court erred by considering the equities. *See* 234

S.W.3d 642, 646 (Tex.2007). We presume, without deciding, that this argument lacks merit. Therefore, we need not address Real Time's argument that Chase waived this argument by failing to plead it.

subject of [Landin Lien 1], [People's Choice] allowed the borrower, Dickerson, to be released from his obligation under [Dickerson Lien 1] and accepted as its borrower Mario Landin. The new borrower was not properly qualified, was not a suitable borrower for the loan transaction, and made very few payments against the new mortgage before going into default. People's Choice had a history of making poor and non-performing subprime mortgages with very high initial fees and high increasing variable rate interest structures with low teaser rates. The subject Landin loan had all of those characteristics. People's Choice qualified the borrower at the low interest rate without regard to his lack of qualification as a borrower at the step-up rate. This borrower made three more similar real estate purchase loans just before closing the subject loan. And, in fact, People's Choice went bankrupt due to loans of this type. This loan was a fraudulent loan. The release of Dickerson from the [Dickerson Lien 1] and the loan to the new, unqualified borrower would create a material prejudice to [Real Time] if the equitable subrogation doctrine were applied in this case.

11.3 [Landin Note 1] was over $41,000.00 greater than the [Dickerson Note 1]. This increased loan amount would create a material prejudice to [Real Time] if the equitable subrogation doctrine were applied in this case.

11.4 [Landin Note 1] was made to a borrower whose financial status made the likelihood of foreclosure a very high probability and, foreseeably, a payment default occurred and foreclosure was attempted. These additional foreclosure expenses are now also charges which could be met before any second lienholders can be paid if the equitable subrogation doctrine were applied in this case. This would create a material prejudice to [Real Time] if the equitable subrogation doctrine were applied in this case.

11.5 Permitting subordination [sic] as requested by Chase would cause accrued interest from the original [Dickerson Lien 1] to be converted under [Landin Lien 1] loan to principal, increasing the base from which interest would be charged, thereby prejudicing the second lien holder with a greater interest rate burden in front of its obligation from the borrower.

11.6 A reasonable second lienholder (such as [Real Time]) would not voluntarily subordinate its position to a note such as [Landin Note 1] because of the material prejudices created by any such subordination.

## B. Legal Insufficiency Regarding Some of the Trial Court's Findings

◼ Chase has challenged the legal sufficiency of the evidence as to all of the above findings. Regarding section 11.2, above, a representative of Real Time, Eric Green testified as follows:

• People's Choice was "generally known as a subprime lender."

• People's Choice "went bankrupt because most of their loans did not pay off."

• Landin "was a bad borrower who took out many properties at that time and they all foreclosed and ... People's Choice did not make that analysis, and

they put a loan on the property which was a horrible loan."

Despite this testimony, we conclude that, under the applicable standard of review, the evidence at trial would not enable reasonable and fair-minded people to find as facts the parts of section 11.2 contained in the accompanying footnote.[3] Because the evidence at trial is legally insufficient to support these parts of section 11.2 of the trial court's findings, we do not consider these findings in the analysis that follows.[4]

 The trial court also found that People's Choice and its successors, including Chase, had a duty to pay off Dickerson Lien 2 and that they knew and acknowledged that they had a duty to pay the amount necessary to extinguish this lien. In addition, the trial court found that People's Choice assumed the responsibility to pay off Dickerson Lien 2. There is no written agreement in the record reflecting such a duty or assumption of responsibility. The record contains two deeds of trust and one promissory note executed by Landin in favor of People's Choice; however, none of these instruments impose on People's Choice the duty to pay off Dickerson Lien 2. In its closing instructions, People's Choice states that the title policy should not have an exception for a lien like Dickerson Lien 2, and Stewart Title's policy complied with this instruction. The instructions do not state that Dickerson Note 2 or Dickerson Lien 2 should be paid

off. Landin did not testify at trial, nor did anyone who worked for People's Choice. None of the witnesses at trial had personal knowledge regarding the scope of People's Choice's agreement, if any, with Landin regarding his purchase of the Property. At trial, a representative of Chase, Deborah Baker, testified as follows:

● Chase was not involved in the closing of the Landin purchase, and Baker does not have personal knowledge regarding that transaction. People's Choice's closing instructions to Stewart Title stated that the title policy should be free from liens except for certain items that did not include Dickerson Lien 2.

● People's Choice would not want a lien ahead of its lien. People's Choice would know that if it did not pay off Dickerson Lien 2, there could be a problem.

● A second lien like Dickerson Lien 2 is normally paid off.

● If a second lien like Dickerson Lien 2 is not paid off, a lender would want a signed subordination agreement to ensure that it was in the first position.

● If People's Choice were aware of Dickinson Lien 2, it would be a "proper thing to do to pay off" this lien.

A representative of Stewart Title, Brandon Linscomb, testified as follows:

● People's Choice's closing instructions stated that People's Choice did not

3. "The new borrower was not properly qualified, was not a suitable borrower for the loan transaction ... People's Choice had a history of making poor and non-performing subprime mortgages with very high initial fees and high increasing variable rate interest structures with low teaser rates ... People's Choice qualified the borrower at the low interest rate without regard to his lack of qualification as a borrower at the step-up rate. This borrower made three more similar real estate purchase

loans just before closing the subject loan. And, in fact, People's Choice went bankrupt due to loans of this type. This loan was a fraudulent loan."

4. We presume for the sake of argument that the evidence is legally sufficient to support the trial court's findings in sections 11.1, 11.3 to 11.6, and the parts of section 11.2 not contained in the previous footnote.

want an exception in the title policy for a prior lien.

- The closing statement for the sale to Landin has a blank next to "Payoff of second mortgage loan." Linscomb does not know what happened, but Stewart Title did not even appear to address Dickerson Lien 2.

- Linscomb has no idea why Dickerson Lien 2 was not paid.

- Because Stewart Title was issuing a title policy without showing Dickerson Lien 2 as an exception, that lien should have been paid.

- Stewart Title was getting closing instructions from People's Choice. In most cases, depending upon the type of instructions, Stewart Title would be acting upon the instructions of People's Choice.

- Stewart Title's responsibilities are set forth in the closing instructions. Stewart Title did not agree to pay off Dickerson Lien 2. The closing instructions speak to the requirements for the title policy.

Under the applicable standard of review, we conclude that the evidence at trial would not enable reasonable and fair-minded people to find that People's Choice or Chase had a duty to pay Dickerson Lien 2, that People's Choice or Chase acknowledged that it had such a duty, or that either entity assumed the responsibility to pay this lien. *See City of Keller*, 168 S.W.3d at 829–30. As this court held in *Texas Commerce Bank*, any intent or attempt by People's Choice to pay off Dickerson Lien 2 did not impose on People's Choice a legal duty to pay off this lien. *See Texas Commerce Bank Nat'l Ass'n v. Liberty Bank*, 540 S.W.2d 554, 557 (Tex. Civ.App.-Houston [14th Dist.] 1976, no writ).

## C. Application of *Texas Commerce Bank National Association v. Liberty Bank* to the Subrogation Issue

■ In *Texas Commerce Bank National Association v. Liberty Bank*, this court held that a bank lender was entitled to subrogation as a matter of law. *See* 540 S.W.2d at 556–57. In that case, a landowner's property was encumbered with a first lien and a second lien. *See id.* at 555. The landowner then executed a deed of trust in favor of Texas Commerce Bank, giving that bank a third lien on the property. *See id.* The landowner then conveyed the property to a company that financed the purchase with a loan from Liberty Bank. *See id.* at 555–56. To secure the loan from Liberty Bank, the company executed a deed of trust in favor of Liberty Bank. *See id.* at 556. This deed of trust contained a provision stating that if the proceeds of the debt secured by the deed of trust were used to pay off any liens on the property, then Liberty Bank would be subrogated to all of the rights of the holders of the indebtedness that was paid. *See id.* The proceeds of the Liberty Bank loan were used to pay off the balances remaining on the first-lien note and the second-lien note, and the holders of these two senior liens executed releases of their liens. *See id.* Liberty Bank tried to pay Texas Commerce the amount due on the third lien on the property; however, the title company was erroneously told that the amount due on the third lien was only $1,319.80. *See id.* As a result of this error, more than $65,500 of the proceeds of the Liberty Bank loan were forwarded to and kept by the seller of the property. Texas Commerce asserted that the erroneous determination of the pay-off figure for the third lien was due to the negligence of Liberty Bank and its agent. Liberty Bank asserted that Texas Commerce's negligence caused the error. *See id.*

Shortly after the closing of the purchase of the property by the company with the Liberty Bank loan, Texas Commerce foreclosed on its lien and bought the property at the trustee's sale. *See id.* The company later defaulted on the Liberty Bank loan, and Liberty Bank foreclosed on its lien. *See id.* At the trustee's sale, Liberty Bank bought the property for an amount less than the total of the amount of the two liens that Liberty Bank had paid off. *See id.*

Liberty Bank sued Texas Commerce and others. *See id.* at 555. Liberty Bank moved for summary judgment asserting that, as a matter of law, Liberty Bank was subrogated to the rights of the holders of the senior liens and that it purchased the property at its foreclosure sale free of Texas Commerce's lien. *See id.* at 556. Liberty Bank asserted that its alleged negligence in ascertaining the pay-off amount of the seller's debt to Texas Commerce was irrelevant to whether Liberty Bank was entitled to subrogation. *See id.* Texas Commerce asserted that Liberty Bank's negligence in failing to ascertain the correct pay-off amount precluded the subrogation of Liberty Bank to the rights of the holders of the senior liens. *See id.* Texas Commerce argued that fact issues regarding Liberty Bank's alleged negligence and the alleged prejudice to Texas Commerce precluded summary judgment. *See id.* at 556.

The trial court granted summary judgment, and this court affirmed the trial court's summary judgment, relying on the Supreme Court of Texas's opinion in *Providence Institution for Savings v. Sims.*[5] See *id.* at 556–57. Texas Commerce asserted it was prejudiced by Liberty Bank's transfer of the remainder of the loan proceeds to the seller rather than to pay off the Texas Commerce loan. *See id.* at 557.

This court, concluding that there was no prejudice to Texas Commerce as a matter of law, held that Liberty Bank was expressly subrogated to the rights of the holders of the two senior liens under Liberty Bank's deed of trust, and that this subrogation did not prejudice Texas Commerce. *See id.* This court stated that, both before the pay-off of the senior liens by Liberty Bank and after this pay-off and subrogation of Liberty Bank to the senior position, Texas Commerce was entitled to the amount remaining after the amounts of these liens were subtracted from the proceeds of the foreclosure sale in a foreclosure of the two senior liens. *See id.* The amount received at the foreclosure of Liberty Bank's lien did not exceed the sum of the amounts of the two prior superior liens that Liberty Bank paid off. *See id.*

This court concluded that, even though Liberty Bank attempted unsuccessfully to pay off the debt to Texas Commerce, Liberty Bank had no legal duty to discharge this debt. *See id.* This court found that, as a matter of law, there was no prejudice to Texas Commerce in allowing Liberty Bank to be subrogated to the rights of the prior senior lienholders. *See id.* Neither actual nor constructive knowledge of an intervening lien would defeat the right of subrogation if the senior lien were discharged under an express agreement by the debtor that the lender would be entitled to subrogation. *See id.* This court concluded that Liberty Bank's negligence was not relevant when the right of subrogation was based in part on such an agreement and was not wholly dependent on equitable principles. *See id.* This court also held that Liberty Bank's right to subrogation was not affected by the prior lienholders' execution of releases of lien

---

5. 441 S.W.2d 516, 519 (Tex.1969).

rather than assignments of lien to Liberty Bank. *See id.*

The facts in *Texas Commerce Bank* are substantially similar to the facts in this case. Though not entirely clear, it appears that the amount paid for the property in Liberty Bank's foreclosure in *Texas Commerce Bank* was less than the total amount paid by Liberty Bank to pay off the senior debt. *See id.* at 556. In the case at hand, People's Choice paid $348,482.63 in December 2004, to satisfy Dickerson Note 1; however, at the foreclosure sale in August 2006, Chase paid $361,883.07. Nonetheless, a party entitled to subrogation based on its paying off of a prior lien is subrogated in the amount of the sum paid by that party plus legal interest thereon from the date of payment, which in this case would be six percent per annum from December 30, 2004.[6] *See* TEX. FIN.CODE ANN. § 302.002 (Vernon 2006); *American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 485 (Tex.1992) (Hecht, J., concurring op., joined by four other justices); *Phipps v. Fuqua*, 32 S.W.2d 660, 663 (Tex.Civ.App.-Amarillo 1930, writ ref'd); *Williams v. Daniel*, 30 S.W.2d 711, 715 (Tex.Civ.App.-Fort Worth 1930, writ ref'd); *see also Vogel v. Glickman*, 117 F.Supp.2d 572, 577 (W.D.Tex. 2000) (applying Texas law), *aff'd*, 276 F.3d 729 (5th Cir.2002). With this legal interest, the amount to which Chase was subrogated exceeded $361,883.07 on the date of the foreclosure sale (August 1, 2006). Therefore, as in *Texas Commerce Bank*, the amount paid at the foreclosure sale was less than the subrogation amount as of the foreclosure sale date.

The trial court appears to have evaluated prejudice based on the presumption that, if subrogation were granted, it would have to be as to all amounts owed under Landin Note 1. Therefore, the trial court considered the fact that, although the initial interest rate of Landin Note 1 was lower than Dickerson Note 1, after two years, Landin Note 1 changed to a high, variable interest rate. However, if subrogation were granted, priority would be given only to the $348,482.63 paid by People's Choice plus six-percent interest thereon from the date of payment. *See* TEX. FIN. CODE ANN. § 302.002; *American Centennial Ins. Co.*, 843 S.W.2d at 485; *Phipps*, 32 S.W.2d at 663; *Williams*, 30 S.W.2d at 715. Therefore, the difference in interest rates is not material to the analysis.

The trial court also emphasized that Landin was a borrower with a high likelihood of default. First of all, this testimony was based on speculation by the corporate representative of Real Time premised on the terms of the Landin purchase rather than on a credit report or other direct information regarding Landin's creditworthiness. Even presuming a high risk that Landin would default, there is no evidence that this risk of default was higher than the risk associated with Dickerson. Although the record also lacks direct information regarding Dickerson's creditworthiness, it reflects that, less than a month after purchasing the Property with no down-payment, Dickerson conveyed title to Gooch and warranted to her that the Property was free from all encumbrances. In fact, the Property was encumbered with two liens from the recent closing. After making at most a few payments against his indebtedness to Aames, Dickerson stopped paying, and his loan went into default. There is no evidence in the record that Gooch assumed Dickerson's indebtedness, and at the time of the sale to Landin, Gooch had filed for bankruptcy protection. Even if it were appropriate to consider prejudice arising from the substitution of

---

6. Dickerson Note 1 had a fixed interest rate of nine percent per annum.

Landin in place of Dickerson as the debtor, the record evidence is legally insufficient to support a finding that this change was prejudicial.

■ This court's opinion in *Texas Commerce Bank* is on point. Absent a decision from a higher court or this court sitting en banc that is on point and contrary to the prior panel decision or an intervening and material change in the statutory law, this court is bound by the prior holding of another panel of this court. *See D'Arcy v. Mead,* No. 14–04–01220–CV, 2006 WL 2165733, at *3 (Tex.App.-Houston [14th Dist.] Aug. 1, 2006, pet. denied) (mem.op.); *City of Webster v. City of Houston,* No. 14–04–00353–CV, 2005 WL 913813, at *1 (Tex.App.-Houston [14th Dist.] Apr. 19, 2005, no pet.) (mem.op.). We have not found a decision from a higher court or this court sitting en banc that is on point and contrary to this prior panel decision, and research has revealed no intervening and material change in the statutory law that would affect this prior panel decision. Therefore, we are bound by this court's prior decision in *Texas Commerce Bank.* Under that precedent, Chase is entitled to subrogation as a matter of law, notwithstanding the factors listed by the trial court.[7]

Real Time asserts that the facts of the case at hand are substantially similar to those in *Fleetwood v. Med Center Bank,* 786 S.W.2d 550, 554–56 (Tex.App.-Austin 1990, writ denied) (*"Fleetwood I "*), a case upon which the trial court relied in its conclusions of law. In that case, Fleetwood held a note secured by a deed of trust in real property, and Fleetwood also owned a lease interest in the real property that was subordinated to that deed of trust. *See Fleetwood I,* 786 S.W.2d at 552.

A subsequent lender advanced funds that were used by the debtor to completely pay off the note and deed of trust held by Fleetwood. *See id.* The trial court granted summary judgment, concluding that the subsequent lender was subrogated to Fleetwood's right under his deed of trust. *See id.* The Third Court of Appeals reversed, relying primarily on a prejudice theory based on a loss of "protection." *See id.* at 555–56. Under this theory, the *Fleetwood I* court concluded that there was a fact issue as to whether granting subrogation to the subsequent creditor would prejudice Fleetwood because it would give a third party control over a deed-of-trust lien superior to his leasehold interest. *See id.* The *Fleetwood I* court reasoned that Fleetwood's holding of this superior lien provided some protection for his leasehold interest because it allowed Fleetwood to avoid foreclosing on the lien and cutting off his subordinate leasehold interest. *See id.*

In the case at hand, Real Time relies upon this protection theory from *Fleetwood I;* however, Real Time fails to address the second appeal in *Fleetwood. See Med Center Bank v. Fleetwood,* 854 S.W.2d 278 (Tex.App.-Austin 1993, writ denied) (*"Fleetwood II "*). After trial on remand resulted in a judgment in favor of Fleetwood, the subsequent lender appealed. *See id.* The *Fleetwood II* court held that, as a matter of law, the subsequent lender was subrogated to Fleetwood's lien. *See id.* at 285–87. The *Fleetwood II* court noted that the facts and issues were more well-developed in the second appeal than in the first appeal; however, the *Fleetwood II* court concluded that Fleetwood's loss-of-protection argument was not a legal or vested right and that it did not raise a fact

7. We do not consider the parts of section 11.2 that have been found not to be supported by

legally sufficient evidence.

issue that would support the trial court's judgment. *See id.* The *Fleetwood II* court effectively abandoned the loss-of-protection theory announced in *Fleetwood I*, and the author of the *Fleetwood I* opinion noted this fact in a dissenting opinion in *Fleetwood II. See id.* at 290 (Jones, J., dissenting). Research has revealed no Texas case other than *Fleetwood I* in which a court has adopted the loss-of-protection theory of prejudice in a subrogation analysis, and the Third Court of Appeals itself has abandoned this theory. We decline to adopt this analysis from *Fleetwood I.* We also note that the decision in *Fleetwood II* supports our analysis in this case. *See Fleetwood II,* 854 S.W.2d at 285–87.

Real Time also asserts that, even if there is a subrogation agreement, the granting of subrogation arises in equity and therefore requires that the court weigh the equities. Real Time argues that, in determining whether a court should allow a party to be subrogated to the rights of another, each case turns on its own facts, and the trial court must weigh the equities in light of all of the facts and circumstances. If one party seeks subrogation based on a contract that it has with all of the parties who are disputing its right to subrogation, this situation would be one of purely contractual subrogation. If one party seeks subrogation and no language from any instrument speaks directly to that party's ability to subrogate, then that situation would be one of purely equitable subrogation.

 The parties in this case argue over whether this case involves purely con-

tractual subrogation or purely equitable subrogation. In cases like the one at hand, there is no contract between the two lenders who are disputing whether the subsequent lender is entitled to subrogation; however, there is an express deed-of-trust provision between the debtor and subsequent lender stating that, if proceeds are used to pay off a prior debt, the lender will be subrogated to all rights of the prior lienholder. Under precedent from the Supreme Court of Texas, such cases fall into a third, hybrid category. In these cases, the right of subrogation is not wholly dependent on the application of a contract, and it is not wholly dependent on equitable principles.[8] *See Sims,* 441 S.W.2d at 519–20; *Fleetwood II,* 854 S.W.2d at 287; *Texas Commerce Bank,* 540 S.W.2d at 557. In such cases, though the analysis does involve equitable considerations, each case is not controlled by its own facts, and the subsequent lender can be entitled to subrogation as a matter of law. *See Sims,* 441 S.W.2d at 519–21; *Fleetwood II,* 854 S.W.2d at 287–88; *Texas Commerce Bank,* 540 S.W.2d at 557. In these cases, the subsequent lender's actual or constructive knowledge of the lien previously filed by the other lender does not defeat the subsequent lender's right to subrogation. *See Sims,* 441 S.W.2d at 519–20; *Fleetwood II,* 854 S.W.2d at 287; *Texas Commerce Bank,* 540 S.W.2d at 557. Likewise, in such cases, the subsequent lender's alleged negligence is not relevant to the subrogation analysis. *See Sims,* 441 S.W.2d at 519–20; *Fleetwood II,* 854 S.W.2d at 287; *Texas Commerce Bank,* 540 S.W.2d at 557.

For these reasons, we conclude that, under *Texas Commerce Bank,* Real Time

8. On appeal, Real Time asserts that Chase waived the doctrine of contractual subrogation by failing to plead it. This waiver argument appears to be directed only to Chase's argument based on purely contractual subrogation, a theory on which this court does not rely in adjudicating this appeal. To the extent this waiver argument is directed at the hybrid subrogation analysis, we conclude that, under a liberal construction of Chase's live pleading at trial, subrogation in this regard was sufficiently pleaded.

and its predecessors in interest would not be prejudiced if Chase were granted subrogation, and the trial court erred by not granting subrogation as a matter of law.[9] *See Texas Commerce Bank*, 540 S.W.2d at 555–57; *Fleetwood II*, 854 S.W.2d at 285–87.

### D. Chase's Proof of Entitlement to Subrogation

■ On appeal, Real Time asserts that Chase did not prove its entitlement to subrogation at trial because there is no evidence that the proceeds of Landin Note 1 were used to pay off Dickerson Note 1. The uncontroverted evidence at trial shows the following:

- On December 3, 2004, a law firm prepared a document showing the payoff amount for a debt owed by Loyd Dickerson, loan number 1205122564, with a current unpaid principal balance of $299,720.71. The original principal amount of Dickerson Note 1 was $300,000. According to this document, if payment were made by December 30, 2004, then the payoff amount for this debt would be $348,482.63, and this amount should be paid to America's Servicing Company ("Servicing Company"). The document also stated that the law firm should be paid $755.09 for attorney's fees.
- A closing statement form and a disbursement worksheet prepared by Stewart Title stated that the Stewart Title file number for the transaction in which Landin purchased the Property was 04202435. These documents show the same payoff amounts as stated in the document from the law firm. The disbursement worksheet shows that, on December 23, 2004, Stewart Title issued a check for $348,482.63 payable to the Servicing Company and a check for $755.09 payable to the law firm.
- The record contains copies of these two checks, which contain the Stewart Title file number for the Landin closing. Correspondence between Stewart Title and the law firm shows that, on December 23, 2004, Stewart Title sent the two checks to the Servicing Company in care of the law firm. The record contains a cover letter showing that the law firm sent the payoff check to the Servicing Company on December 27, 2004. This cover letter makes reference to the same loan number as that contained in the law firm's statement of the payoff amount.
- The reverse side of this check shows that the Servicing Company endorsed the check on December 28, 2004, and that it was negotiated on December 30, 2004.
- On February 21, 2005, Stewart Title sent the law firm a letter referencing the file number for the Landin transaction, describing the Property, and containing the loan number for the debt that had been paid off. Attached to the letter was a release-of-lien document to be executed.
- On December 19, 2005, Wells Fargo executed a release of lien. On January 18, 2006, this document was recorded at the request of the Servicing Company. This release refers to the same loan number as that contained in the law firm's statement of the payoff amount. In the release, Wells Fargo states that it is the owner of the lien in question and that this lien has been paid in full and satisfied. The lien in question is described using the record-

9. Real Time also argues that Chase is not entitled to subrogation because it did not request or obtain a fact finding regarding its theory of subrogation. No such request or finding is needed. The evidence conclusively proved Chase's entitlement to subrogation.

ing information for Dickerson Lien 1. The "Original Borrower" is listed as Loyd Dickerson and the "Original Beneficiary" as Aames.

Real Time asserts that the evidence is insufficient to prove that the proceeds from Landin Note 1 were used to pay off Dickerson Note 1. Real Time focuses on the fact that the payoff documents and check refer to the Servicing Company and that the release was executed by Wells Fargo, rather than the Servicing Company or Aames. Real Time also notes that the release was signed almost one year after the closing of the Landin transaction. Based on the above-described evidence, which was undisputed, we conclude that the evidence at trial conclusively proved that the proceeds from Landin Note 1 were used to payoff Dickerson Note 1, which was secured by Dickerson Lien 1. This evidence would not enable reasonable and fair-minded people to find otherwise.[10] *See City of Keller,* 168 S.W.3d at 829–30.

### E. The Extent of Chase's Entitlement to Subrogation

■ In the alternative, Real Time argues that, even if Chase is entitled to subrogation, the amount to which it should be subrogated is limited to the original principal amount of Dickerson Note 1, $300,000. The cases upon which Real Time relies do not support this proposition; rather, as discussed above, if a party pays off a prior lien and is entitled to subrogation, the subrogation amount is the payoff amount plus legal interest thereon from the date of payment. *See* Tex. Fin. Code Ann. § 302.002 (Vernon 2006); *American Centennial Ins. Co.,* 843 S.W.2d at 485; *Phipps,* 32 S.W.2d at 663;

*Williams,* 30 S.W.2d at 715; *see also Vogel,* 117 F.Supp.2d at 577. The subrogation amount is not limited to the original principal amount of the prior debt that has been paid. *See American Centennial Ins. Co.,* 843 S.W.2d at 485; *Phipps,* 32 S.W.2d at 663; *Williams,* 30 S.W.2d at 715; *see also Vogel,* 117 F.Supp.2d at 577.

### F. Chase's Ability to Recover Attorney's Fees under the Declaratory Judgments Act

■ Though the trial court awarded Real Time attorney's fees under the Declaratory Judgments Act, Real Time asserts that Chase cannot recovery attorney's fees under this statute. Real Time cites a line of cases that hold attorney's fees are not available in a suit to quiet title or remove a cloud on title. *See, e.g., Southwest Guaranty Trust Co. v. Hardy Road 13.4 Joint Venture,* 981 S.W.2d 951, 956 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). Though Chase asserted claims in the trial court for slander of title and brought suit to quiet title, in this court Chase seeks only declaratory relief as a matter of law and attorney's fees, which Chase also requested in the trial court. Under the Declaratory Judgments Act, "[a] person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) (Vernon 2008). The

---

10. Real Time also argues that Chase is not entitled to subrogation because it did not request or obtain a fact finding that the proceeds from Landin Note 1 were used to payoff Dickerson Note 1. No such request or finding is needed in this case. The evidence conclusively proves this proposition.

declaratory relief that Chase seeks in this court is not a judgment quieting or adjudicating title; rather, it is a judgment determining the validity of competing instruments and resolving a dispute between two purported lienholders. Therefore, the trial court has the discretion to award Chase reasonable and necessary attorney's fees. *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.009 (Vernon 2008); *Red Rock Properties 2005, Ltd. v. Chase Home Finance, L.L.C.*, No. 14–08–00352–CV, 2009 WL 1795037, at *5–6 (Tex.App.-Houston [14th Dist.] June 25, 2009, no pet.) (mem.op.); *Aquaduct, L.L.C. v. McElhenie*, 116 S.W.3d 438, 444–45 (Tex.App.-Houston [14th Dist.] 2003, no pet.).

## V. Conclusion

Under the applicable standard of review, the evidence presented at trial is legally insufficient to support the trial court's seventeenth finding of fact as well as the portions of the fourteenth finding and of section 11.2 of the findings of fact discussed above. The trial evidence conclusively proves that the proceeds from Landin Note 1 were used to payoff Dickerson Note 1, which was secured by Dickerson Lien 1. Under *Texas Commerce Bank*, Real Time and its predecessors in interest are not prejudiced by granting subrogation to Chase, and the trial court erred by not granting subrogation in favor of Chase as a matter of law. The amount of this subrogation is not limited to $300,000; the subrogation amount is $348,482.63, plus six-percent interest per annum from December 30, 2004.

The award of attorney's fees and costs in a declaratory judgment action is within the trial court's discretion and is not dependent upon a finding that a party substantially prevailed. *See Barshop v. Medina*, 925 S.W.2d 618, 637–38 (Tex. 1996). Because our disposition of the case on appeal substantially affects the trial court's judgment, remand is warranted so that the trial court can address what costs and attorney's fees, if any, should be awarded under the Declaratory Judgments Act. *See id.; Fitzgerald v. Antoine Nat'l Bank*, 980 S.W.2d 228, 232 (Tex.App.-Houston [14th Dist.] 1998, no pet.). Accordingly, we reverse the trial court's judgment, and we remand to the trial court with instructions to (1) determine the amount, if any, of costs and reasonable and necessary attorney's fees that should be awarded under the Declaratory Judgments Act; [11] and then (2) render a judgment in which the trial court:

- orders that Real Time Resolutions, Inc. take nothing by its counterclaim;
- declares that, at all times relating to the August 2006 foreclosure sale, Landin Lien 1 (Plaintiff's Exhibit 6 at trial) was superior to Dickerson Lien 2 (Plaintiff's Exhibit 2 at trial); and
- declares that the foreclosure of Landin Lien 1 cut off and extinguished any lien in favor of Real Time Resolutions, Inc. and Cal Western Reconveyance Corporation.

In its judgment, the trial court shall award such costs and reasonable and necessary attorney's fees as the trial court determines are equitable and just.

---

11. The parties stipulated that $50,000 would be a reasonable and necessary attorney's fee for Chase. On remand, the trial court may exercise its discretion to award this amount; however, the trial court also may exercise its discretion to award no attorney's fees or to award another amount that the trial court finds is reasonable and necessary.