**Reversed and Remanded and Opinion filed April 23, 2019.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00466-CV

---

## RIMA GROUP, INC., Appellant

## V.

## DAVID H. JANOWITZ AND CYNTHIA EDMISTON, AS TRUSTEES OF THE JANOWITZ EDMISTON FAMILY LIVING TRUST, Appellees

**On Appeal from the 80th District Court
Harris County, Texas
Trial Court Cause No. 2017-00370**

# O P I N I O N

This appeal arises out of contracts for the sale of real property. The buyer appeals the trial court's grant of the seller's summary-judgment motion as to the buyer's claims for specific performance of the contracts. The buyer challenges the trial court's ruling that as a matter of law the seller properly terminated the contracts. Concluding that a genuine fact issue as to waiver precluded summary judgment in the seller's favor, we reverse and remand.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Amir Bajmanlou, on behalf of appellant Rima Group, Inc., as buyer, and appellees David H. Janowitz and Cynthia Edmiston, as trustees of the Janowitz Edmiston Family Living Trust (the "Trust"),[1] as seller, executed two contracts for the sale of real property in Harris County, Texas. Each contract contained a "Seller Financing Addendum," under which Rima agreed to deliver a credit report to the Trust within five days after December 9, 2016 (the "Effective Date"), the effective date of each contract. Rima did not deliver a credit report to the Trust on or before December 14, 2016.[2]

Under each contract, the parties agreed that if Rima did not provide the credit report within the specified time, the Trust could terminate the contract by notice to Rima within seven days after the expiration of the time for delivery of the credit report. In this litigation, the parties agree that time for delivery of the credit report expired on December 14, 2016 (the "Credit Report Deadline"), and that if the Trust chose to terminate the contract based on Rima's failure to deliver a credit report timely, the Trust had to give notice of termination on or before December 21, 2016 (the "Termination Deadline").

---

[1] Each contract recites that the "Seller" is "Janowitz/Edmiston Family Living Trust." In the trial court and on appeal, each side refers to this trust as the "Janowitz Edmiston Family Living Trust." We need not decide the correct name of the trust to dispose of this appeal.

In addition, Rima sued the trustees of the trust as defendants, and the trustees filed an answer. *See* Tex. Prop. Code Ann. § 111.004(4); *Ray Malooly Trust v. Juhl*, 186 S.W.3d 568, 570 (Tex. 2006) (stating that "[t]he general rule in Texas . . . has long been that suits against a trust must be brought against its legal representative, the trustee."). Nonetheless, various documents (such as the motion for summary judgment and the appellees' brief) purport to be filed by the Trust itself rather than the trustees. The distinction between the trustees of the Trust and the Trust is not material to the disposition of this appeal. For convenience, we refer to the Trust throughout this opinion, even if, at times, the document in question may refer to the trustees of the Trust.

[2] In section II., below, we address the summary-judgment evidence regarding communications between Bajmanlou on behalf of Rima and David Janowitz on behalf of the Trust during the period between December 9, 2016, and December 21, 2016.

On the Termination Deadline, the Trust gave notice to Rima that the Trust was terminating each contract based solely on Rima's failure to deliver a credit report.

Two weeks later, Rima filed this suit against the Trust[3] seeking specific performance of each contract as well as reasonable attorney's fees. The Trust filed an answer and a counterclaim against Rima. The Trust asserted claims for breach of each contract and sought a declaratory judgment that the Trust properly terminated each contract and is entitled to the earnest money. The Trust also sought to recover reasonable and necessary attorney's fees.

Five days after answering Rima's petition, the Trust filed a traditional motion for summary judgment and submitted the following proof: (1) an affidavit of Cynthia Edmiston, (2) authenticated copies of each contract, (3) the notice of termination and a related email; and (4) an attorney's-fees affidavit from the Trust's attorney. In the motion, the Trust asserted that (1) the Trust properly terminated each contract based on Rima's failure to deliver a credit report; (2) Rima breached each contract by not delivering a credit report; (3) the lis pendens that Rima filed on the real property at issue is wrongful because Rima cannot obtain specific performance of contracts that Rima breached; (4) Rima is not entitled to specific performance; (5) under each contract, the Trust is entitled to the earnest money; (6) the Trust is entitled to recover its reasonable and necessary attorney's fees; and (7) the Trust is entitled to declarations that the Trust properly terminated the contracts, the Trust gets the earnest money, and the Trust gets a release of the lis pendens.

Rima responded in opposition providing the following summary-judgment proof: (1) an affidavit from Bajmanlou, (2) an affidavit from Rima's attorney; (3)

_____

[3] *See* footnote 1, above.

3

several emails, and (4) the notice of termination.  Rima asserted that a fact issue exists as to whether the Trust waived, or is estopped from requiring, compliance with the requirement that Rima deliver to the Trust a credit report by the Credit Report Deadline. Rima asserted that the Trust breached the contracts by purporting to terminate the contracts without a valid reason to do so.  Rima asserted that there is a fact issue as to whether Rima is entitled to specific enforcement of the contracts.  Rima also relied on its attorney's affidavit challenging two aspects of the Trust's proof regarding reasonable and necessary attorney's fees.

At the Trust's request, the trial court dismissed without prejudice the Trust's claim to recover the earnest money.

The trial court rendered a final judgment in which it granted the part of the Trust's motion that requested declaratory relief and attorney's fees.   In the judgment, the trial court declared that the Trust properly terminated the contracts and that the "Lis Pendens filed by [Rima] is not valid and shall be released."  The trial court also ordered Rima to pay the Trust reasonable and necessary attorney's fees for work in the trial court and also made contingent awards for attorney's fees on appeal.  The trial court denied relief as to Rima's claims and as to the Trust's breach-of-contract claim.

## II.  ISSUES AND ANALYSIS

On appeal, Rima asserts in three issues that (1) the trial court erred in granting the Trust's summary-judgment motion due to fact issues as to waiver and estoppel; (2) the trial court erred in granting summary judgment because the Trust failed to present evidence that the Trust terminated each contract in good faith and there is evidence that the Trust failed to act in good faith in terminating the contracts; and (3) the trial court erred in granting the Trust's summary-judgment motion as to attorney's fees.

4

As to a traditional motion for summary judgment, if the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). In our de novo review of a trial court's summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

**A.  Does the summary-judgment evidence raise a genuine fact issue as to waiver?**

**1.  The Contracts' Unambiguous Language**

The relevant parts of each contract are the same. In each contract, the parties agreed that the contract contains the parties' entire agreement and that the "Seller Financing Addendum" is part of the contract. In each "Seller Financing Addendum," the parties agree in pertinent part as follows:

> **A. CREDIT DOCUMENTATION.** To establish Buyer's creditworthiness, Buyer shall deliver to Seller within 5 days after the effective date of this contract, ☑ credit report . . . . Buyer hereby authorizes any credit reporting agency to furnish copies of Buyer's credit reports to Seller at Buyer's sole expense.
>
> **B. BUYER'S CREDIT APPROVAL.** If the credit documentation described in Paragraph A is not delivered within the specified time, Seller may terminate this contract by notice to Buyer within 7 days after expiration of the time for delivery, and the earnest money will be paid to Seller. If the credit documentation is timely delivered, and

5

Seller determines in Seller's sole discretion that Buyer's credit is unacceptable, Seller may terminate this contract by notice to Buyer within 7 days after expiration of the time for delivery and the earnest money will be refunded to Buyer. If Seller does not terminate this contract, Seller will be deemed to have approved Buyer's creditworthiness.

In construing a contract, our primary concern is to ascertain and give effect to the parties' intentions, as expressed in the contract. *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). To ascertain the parties' true intentions, we examine the entire agreement in an effort to harmonize and give effect to all its provisions so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id*. But, when a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). We cannot rewrite the contract or add to its language under the guise of interpretation. *See American Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 162. Rather, we must enforce the contract as written. *See Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008).

Under the unambiguous text of each contract, Rima had to deliver a credit report to the Trust on or before the Credit Report Deadline—within 5 days after the Effective Date of each contract. The parties do not dispute this deadline, nor do they dispute that Rima failed to deliver a credit report to the Trust on or before the deadline. Under the clear text of each contract, if Rima does not deliver a credit report to the Trust on or before the Credit Report Deadline, the Trust may

terminate the contract by notice to Rima on or before the Termination Deadline.

Each contract provides that if Rima had delivered a credit report to the Trust on or before the Credit Report Deadline, and if the Trust had determined in its sole discretion that Rima's credit was unacceptable, then the Trust would have had the right to terminate each contract by notice to Rima on or before the Termination Deadline, and Rima would have been entitled to a refund of the earnest money. Rima and the Trust both agree that this termination provision was not triggered because Rima did not deliver a credit report to the Trust on or before the Credit Report Deadline.

The parties do not dispute that "within 7 days after expiration of the time for delivery" means on or before the Termination Deadline. Rima does not dispute that the Trust gave notice of termination on the Termination Deadline based on Rima's failure to deliver the credit report. Instead, Rima asserts that the summary-judgment evidence raises a fact issue as to whether the doctrines of waiver and estoppel preclude the Trust from terminating each contract based on Rima's failure to deliver a credit report on Rima to the Trust on or before the Credit Report Deadline.

### 2.    Waiver Law

Waiver may be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming the known right. *See Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d. 781, 790 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Waiver is largely a matter of intent, and for implied waiver to be found through a party's conduct, intent must be demonstrated clearly by the surrounding facts and circumstances. *See id*. Ordinarily waiver is a question of fact, but waiver may be decided as a matter of law based on undisputed evidence regarding the facts and circumstances. *See id*. at

790–91.[4]

### 3. Summary Judgment Proof Proffered in Support of Waiver

In his summary-judgment affidavit, Bajmanlou testified as follows:

(1) Bajmanlou is Rima's President.

(2) Rima signed two contracts for the purchase of real estate from the Trust.

(3) The contracts provide for Rima to provide its credit report to the Trust on or before the Credit Report Deadline.

(4) In connection with the performance of this contract condition, Bajmanlou dealt primarily with David Janowitz.

(5) Janowitz assured Bajmanlou that the credit report was only a formality for seller financing, since Rima was paying 25% of the purchase price as a down payment at closing.

(6) Bajmanlou and Janowitz recognized that the "main credit reporting agencies" did not provide business credit reports on companies.

(7) "During the five day period, [Janowitz] told [Bajmanlou] that [Janowitz] would obtain the required credit report from Dunn & Bradstreet."

(8) On December 16, 2016, two days after the Credit Report Deadline, Janowitz sent Bajmanlou an email stating that the Trust was ordering a business credit report on Rima from Dunn & Bradstreet and sending Bajmanlou the bill, which Bajmanlou received.

(9) Based on this email, Bajmanlou's discussions with Janowitz, and Janowitz's actions in ordering the business credit report from Dunn & Bradstreet, Bajmanlou understood that the condition of furnishing a credit report on Rima had been satisfied.

(10) In the same email Janowitz requested an individual credit report from Bajmanlou, even though such a credit report is not required under the contracts.

(11) Bajmanlou was willing to provide an individual credit report because his credit is excellent. On December 20, 2016, six days after the Credit Report

---

[4] No party has asserted a fraud claim or fraudulent inducement, and the contracts do not contain a disclaimer-of-reliance provision. Therefore, cases addressing fraud claims, fraudulent inducement, and disclaimer-of-reliance provisions are not on point.

8

Deadline, Bajmanlou had an exchange of emails with Janowitz, in which Janowitz again requested that Bajmanlou send a personal credit report. That evening Bajmanlou replied to Janowitz that Bajmanlou was prepared to produce the individual credit report but wanted to redact personal, confidential information.

(12)    On the Termination Deadline, the Trust, suddenly and without warning, purported to terminate the contracts based solely on Rima's failure to provide a credit report by the Credit Report Deadline.

The summary-judgment evidence also contains an email that Janowitz sent to Bajmanlou on December 16, 2016, two days after the Credit Report Deadline and five days before the Termination Deadline. In the email, Janowitz says that it is difficult to find out how to obtain credit reports but that Janowitz had ordered a business credit report from Dunn & Bradstreet. In the email, Janowitz also states that the Trust needs an individual credit report on Bajmanlou. The evidence also contains a second email that Janowitz sent Bajmanlou ten minutes later, in which Janowitz says:

> Amir, here is a copy of the paid invoice for the business credit report. It shows only the medical practice. You are running the investment and construction out of the same business? There is very little information in the report, and we still need the individual report. I will request it from Transunion, and they will send you a form to fill out.

The summary-judgment evidence includes the invoice from Dunn & Bradstreet. The invoice does not show anything about a medical practice.

Later the same day (December 16, 2016), Bajmanlou emailed Janowitz saying that Bajmanlou had asked an accountant to obtain a credit report and send it to him. Bajmanlou stated that he would forward to report to Janowitz as soon as Bajmanlou received it.

The summary-judgment evidence contains two emails from December 20, 2016, the day before the Termination Deadline. In the first Janowitz gives

9

Bajmanlou advice on a way to obtain a free credit report immediately that Bajmanlou could then email to Janowitz. Janowitz asks Bajmanlou to obtain a credit report and send it to him. Janowitz says that "[w]e are past the deadline for receiving your credit report, and the credit score you sent is not sufficient. Please let's stay with the contract terms." Bajmanlou responded with an email that evening saying that his "broker" had obtained a credit report on Bajmanlou and that the "Mid Score" was 807. But, Bajmanlou said that the detailed credit report had confidential information that Bajmanlou wanted to keep confidential. Bajmanlou asked Janowitz to let him know if Janowitz had any suggestions as to how Janowitz would be able to see the report without the confidential information. The Trust sent the termination letter the next day.

Attached to the summary-judgment motion is an affidavit of Cynthia Edmiston. Edmiston testifies that she and her husband David Janowitz are the trustees of the Trust. In addressing the execution and terms of the two contracts, Edmiston testifies that the Trust exercised its option to terminate the contracts based on Rima's failure to provide the Trust a credit report on Rima on or before the Credit Report Deadline. The Trust did not submit an affidavit from Janowitz or any evidence addressing whether Janowitz told Bajmanlou during the five-day period that Janowitz would obtain the credit report on Rima required under the contracts.

Bajmanlou testified that between December 9, 2016 and December 14, 2016 (the Credit Report Deadline), Janowitz told Bajmanlou that Janowitz would obtain the required credit report from Dunn & Bradstreet. Janowitz's December 16, 2016 emails to Bajmanlou corroborate this testimony. In these emails, Janowitz indicated that he had been investigating how to get a credit report on Rima, and that Janowitz had ordered and received a credit report on Rima from Dunn &

10

Bradstreet on December 16, 2016. Janowitz stated that "[t]here is very little information in the report" and that the Trust wanted a credit report on Bajmanlou. Under the contracts, to avoid giving the Trust the right to terminate the contracts, Rima had to deliver a credit report on Rima to the Trust on or before the Credit Report Deadline. If in the days before that deadline Janowitz intentionally told Bajmanlou that Janowitz would obtain the credit report on Rima required under the contracts, Bajmanlou might think that Rima did not need to obtain and deliver the credit report as required by the contracts because the Trust would do so. This action by Janowitz would be inconsistent with the Trust's known right to receive delivery from Rima of a credit report on Rima on or before the Credit Report Deadline (the "Right"). The Trust asserts on appeal Janowitz's December 20, 2016 email shows that the Trust did not waive the Right. In this email, Janowitz says, "[w]e are past the deadline for receiving your credit report, and the credit score you sent is not sufficient. Please let's stay with the contract terms." But, Janowitz sent this email the day before the Trust purported to terminate the contracts, and after the Credit Report Deadline.

Under the applicable standard of review, we conclude that the summary-judgment evidence raises a genuine fact issue as to whether the Trust intentionally relinquished the Right or engaged in intentional conduct inconsistent with claiming the Right. *See Trelltex, Inc.*, 494 S.W.3d. at 790; *Comiskey v. FH Partners, LLC*, 373 S.W. 3d 620, 641 (Tex. App.—Houston [14th Dist.] Apr. 12, 2012, pet. denied). We sustain the part of the first issue in which Rima asserts that the trial court erred in granting summary judgment because Rima raised a fact issue as to waiver.

11

**B.    Did Rima sufficiently raise its estoppel contention in the trial court?**

In its first issue Rima also asserts that the trial court erred in granting summary judgment because Rima raised a fact issue as to estoppel.  The Trust asserts that Rima waived any estoppel argument by not raising estoppel in its trial-court pleadings.  Rima did not mention estoppel in its petition or in an answer to the Trust's counterclaim. Though the Trust did not specially except to Rima's pleadings, even under a liberal construction of Rima's pleadings, Rima did not raise any estoppel doctrine. *See Lenox Barbeque and Catering, Inc. v. Metro. Transit Auth. of Harris County*, 489 S.W.3d 529, 536 (Tex. App.—Houston [14th Dist.] 2016, no pet.). The pleadings thus do not set up estoppel as an issue in the case.

Nonetheless, the Trust failed to object that in its summary-judgment response Rima relied upon estoppel despite Rima's failure to plead estoppel.  Thus, if Rima sufficiently raised estoppel in its summary-judgment response, then the Trust would have tried the issue by consent.  *See Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (per curiam);  *Danford Maint. Serv., Inc. v. Dow Chemical Co.*, No. 14-12-00507-CV, 2013 WL 6388381, at *9 (Tex. App.—Houston [14th Dist.] Nov. 21, 2013, pet. denied) (mem. op.).  So, we next consider the effect, if any, of Rima's references to estoppel in its summary-judgment response.

The law features many types of estoppel, including quasi-estoppel, equitable estoppel, judicial estoppel, and estoppel by deed.  *See Nash v. Beckett*, 365 S.W.3d 131, 142 (Tex. App.—Texarkana 2012, pet. denied).  Under this court's binding precedent, for Rima to have sufficiently raised a doctrine of estoppel in its summary-judgment response, Rima must have presented or argued all the elements of that estoppel doctrine in the trial court.  *See Deutsche Bank Nat. Trust Co. v.*

*Stockdick Land Co.*, 367 S.W.3d 308, 315–18 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).  In its summary-judgment response, Rima did not present or argue any elements of any estoppel doctrine.  Thus, Rima did not sufficiently raise any doctrine of estoppel in its summary-judgment response, and this court may not reverse the trial court's summary judgment based on any doctrine of estoppel.  *See id*.  We therefore overrule the remainder of the first issue.[5]

**C.    Did the Trust have to a duty to act in good faith in terminating the contracts?**

In its second issue, Rima asserts that the trial court erred in granting summary judgment because the Trust failed to present evidence that the Trust terminated each contract in good faith and the record contains evidence that the Trust failed to act in good faith in terminating the contracts.  Rima appears to be arguing that the Trust had a duty to act in good faith because each contract gave the Trust the right to terminate if the Trust, in its discretion, determined Rima's performance to be unsatisfactory.

Under the plain text of each contract, the parties do not agree that the parties will act in good faith in performing the contract or that the Trust will act in good faith in terminating the contract based on Rima's failure to deliver a credit report on Rima to the Trust on or before the Credit Report Deadline.  Under Texas common law, contracts do not impose a general duty of good faith and fair dealing.  *See City of Midland v. O'Bryant*, 18 S.W.3d 209, 215 (Tex. 2000).  These contracts do not give the Trust the right to terminate the contract based on the Trust's discretionary determination as to whether Rima's performance is satisfactory.  Instead, under each contract, if Rima does not deliver a credit report to the Trust on

---

[5] This appellate ruling does not preclude Rima from raising one or more estoppel doctrines on remand.

13

or before the Credit Report Deadline, the Trust may terminate the contract by notice to Rima on or before the Termination Deadline. Thus, the trigger for the Trust's right to terminate the contract is not the Trust's dissatisfaction with Rima's performance; rather, the trigger is Rima's failure to deliver a credit report as required by the contract. In this context, the Trust did not have a duty to act in good faith in terminating the contracts. *See Comm. Health Sys. Prof. Servs.*, 525 S.W.3d 671, 684–85 (Tex. 2017); *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 665 (Tex. 1990), *superseded on other grounds by statute as recognized in Coinmach Corp. v. Aspenwood Apartment Corp.,* 417 S.W.3d 909, 923 (Tex. 2013). The cases Rima cites are not on point. We overrule the second issue.

### III. CONCLUSION

Rima did not sufficiently raise any doctrine of estoppel in its summary-judgment response, so we may not reverse the trial court's summary judgment based on estoppel. The Trust did not have a duty to act in good faith in terminating the contracts. Because the summary-judgment evidence raised a genuine issue of material fact as to whether the Trust waived the Right, the trial court erred in granting summary judgment as to the respective claims of Rima and the Trust. Today's disposition substantially affects the trial court's judgment and thus warrants reversal of the trial court's attorney's-fees awards, so that on remand the trial court can address each party's request for attorney's fees in light of the relief granted in the trial court's final judgment on remand.[6] *See Chase Home Fin., L.L.C. v. Cal West. Reconveyance Corp.,* 309 S.W.3d 619, 634 (Tex. App.– Houston [14th Dist.] 2010, no pet.). Therefore, we reverse the trial court's

---

[6] Because we reverse the attorney's-fee awards on this basis, we need not and do not address Rima's challenges in the third issue to the reasonableness of the fees awarded.

judgment and remand for further proceedings.

/s/    Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Christopher and Bourliot.