**AQUADUCT, L.L.C., Appellant,**

v.

**Travis J. McELHENIE and Wife, Lisa Christian McElhenie, and North American Mortgage Company, Appellees.**

No. 14–02–00708–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 9, 2003.

Rehearing Overruled Oct. 2, 2003.

H. Miles Cohn, Houston, for appellant.

Bradford W. Irelan, E. John Gorman, G.P. Matherne, Houston, for appellees.

Panel consists of Justices YATES, HUDSON, and SEYMORE.

## OPINION

CHARLES W. SEYMORE, Justice.

Appellant Aquaduct, L.L.C. challenges the trial court's finding that it authorized its loan servicing agent to receive full payment of a mortgage note and the trial court's award of attorney's fees to appellee, North American Mortgage Company. We affirm.

## I. PROCEDURAL AND FACTUAL BACKGROUND

In November 1996, Travis McElhenie and Linda Christian ("the McElhenies")[1] executed a promissory note for $28,045.22 in favor of Millennium Interests, Ltd. ("the McElhenie Note") to purchase a homestead. The McElhenie Note required the McElhenies, as mortgagors, to repay Millennium Interests, as mortgagee, "both principal and interest" at 10% annually in "360 monthly principal and interest installments of $216.12 per month," and a tax escrow fee of $15 per month. The first installment was due on November 1, 1996, followed by successive installments payable on the first of each month "until the full amount of the consideration of principal and interest is paid." To secure this mortgage debt, the McElhenies signed a deed of trust ("the Millennium Deed") that same month, granting Millennium Interests a vendor's lien and a deed-of-trust lien in the property. Millennium recorded this deed. Neither the McElhenie Note nor the Millennium Deed established any penalty for early payment of the full amount owing on the mortgage debt.

In April 1997, Millennium transferred the McElhenie Note to Aquaduct, L.L.C., together with the liens securing the McElhenies' mortgage debt.[2] The transfer of lien instrument instructed the Harris County clerk's office to return the original transfer to Gibraltar Mortgage Corporation ("Gibraltar") after filing. Aquaduct appointed Gibraltar as its loan servicing agent and authorized Gibraltar to collect monthly payments from the McElhenies on the McElhenie Note. As the loan servicing agent, Gibraltar collected principal and interest payments from the McElhenies, accounted for that money to Aquaduct each month, and forwarded the payments to Aquaduct each month.

In September 1998, the McElhenies refinanced their mortgage through National Mortgage Link, I Ltd. ("National Mortgage Link") by renewing and extending the McElhenie Note. To do so, the McElhenies executed a deed of trust naming National Mortgage Link as the beneficiary and a renewal and extension rider accompanying the deed of trust ("Renewed McElhenie Note"). The deed of trust was recorded. In refinancing their mortgage, the McElhenies agreed to pay National Mortgage $86,850, representing the amount they owed under the Renewed McElhenie Note. To secure the Renewed McElhenie Note, the McElhenies encum-

---

1. The record shows Travis McElhenie married Linda Christian shortly after November 1996, and she assumed his surname.

2. Several other notes were transferred from Millennium to Aquaduct at this time, but those notes are not the subject of this appeal.

bered their homestead with a lien in favor of National Mortgage Link.

Old Republic Title Company ("Old Republic") represented National Mortgage Link at the closing of this transaction. At the closing, in a simultaneous transaction, National Mortgage Link assigned the Renewed McElhenie Note and the accompanying deed of trust lien to North American Mortgage Company ("North American"). The deed was recorded. Old Republic requested and obtained from Gibraltar a statement of the total remaining balance on the McElhenie Note. A title insurance policy was also obtained and it revealed in part the lien Millennium assigned to Aquaduct. To take a first lien position on the McElhenies' homestead, National Mortgage Link and North American paid to Gibraltar the remaining balance on the McElhenie Note ($28,126.61) in September 1998. Old Republic, acting on behalf of National Mortgage Link and North American, sent the check to Gibraltar and also asked Gibraltar to execute and return to Old Republic for filing a release of lien or transfer of lien. Gibraltar ignored this request, and deposited the check in its Aquaduct account. However, Gibraltar never paid these funds over to Aquaduct, and Gibraltar apparently converted the funds to its own use.

In August 2000, Aquaduct filed this suit asking the trial court to declare its lien superior to North American's lien on the McElhenie homestead. Aquaduct argued payment to Gibraltar of the full amount owing under the McElhenie Note was improper because Gibraltar only had authority to accept monthly payments of principal and interest. North American counterclaimed for a judgment declaring its lien superior to Aquaduct's lien. Following a bench trial, the court found Aquaduct authorized its agent, Gibraltar, to accept payment in full of outstanding balances on its

notes, declared Aquaduct's lien satisfied, and ordered Aquaduct to execute a release of lien.

## II. ISSUES PRESENTED

Aquaduct presents the following issues for review:

(1) Is there evidence to support the trial court's finding that Aquaduct's loan-servicing agent, Gibraltar, had authority to collect final payment on the McElhenie's mortgage note?

(2) Is circumstantial evidence sufficient to support the trial court's finding that Gibraltar had authority to collect final payment on the note?

(3) Was North American entitled to attorney's fees under the Declaratory Judgments Act when its counterclaim was allegedly a suit to clear title?

(4) Was the trial court's award of attorney's fees under the Declaratory Judgments Act equitable and just?

## III. ANALYSIS AND DISCUSSION

**A. Did Gibraltar have authority to collect the final payment on the McElhenie mortgage note?**

In its first and second issues, Aquaduct challenges the legal sufficiency of the evidence to support the trial court's finding that Gibraltar had agency authority to collect payment of the outstanding balance on the McElhenie Note. In conducting a no-evidence analysis, we review the evidence in a light that tends to support the disputed findings and disregard all evidence and inferences to the contrary. *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 782 (Tex.2001). If more than a scintilla of evidence exists, it is legally sufficient. *Id.* More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclu-

sions by reasonable minds about a vital fact's existence. *Id.* at 782–83.

■■■ Aquaduct maintains the trial court improperly relied on circumstantial evidence to infer, from Gibraltar's authority to collect monthly payments of principal and interest, that Gibraltar had authority to collect payment in full on behalf of Aquaduct. The question of agency is usually one of fact, and circumstantial evidence may be used to establish the agency relationship and to determine the scope of the agent's authority. *St. Paul Surplus Lines Ins. Co., Inc. v. Dal–Worth Tank Co., Inc.,* 917 S.W.2d 29, 48 (Tex.App.-Amarillo 1995, no writ); *Foundation Reserve Ins. Co. v. Wesson,* 447 S.W.2d 436, 438 (Tex.Civ.App.-Dallas 1969, writ ref'd). Absent actual or apparent authority, an agent cannot bind a principal. *See Currey v. Lone Star Steel Co.,* 676 S.W.2d 205, 209 (Tex.App.-Fort Worth 1984, no writ). Both actual and apparent authority are created through conduct of the principal communicated either to the agent (actual authority) or to a third party (apparent authority). *See id.* at 210. Actual authority denotes that authority which the principal intentionally confers upon the agent, or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess. *Suarez v. Jordan,* 35 S.W.3d 268, 272–73 (Tex. App.-Houston [14th Dist.] 2000, no pet.); *see also Spring Garden 79U, Inc. v. Stewart Title Co.,* 874 S.W.2d 945, 948 (Tex. App.-Houston [1st Dist.] 1994, no writ).

■■■ The record shows that Gibraltar had implied actual authority to collect full payment of outstanding balances on behalf of Aquaduct. Aquaduct acquired several mortgage notes, including the McElhenie Note, from Millennium Interests, Ltd. Millennium had hired Gibraltar to service its notes, but required debtors to send payments directly to Millennium, rather than sending them to Gibraltar. After acquiring the notes, Aquaduct kept Gibraltar as the loan servicer without making a written agreement that defined the scope of Gibraltar's authority. Vernon Young, the president of Aquaduct, testified that, although not explicitly discussed, Gibraltar had authority to perform numerous tasks, including authority: (1) to conduct the day-to-day business of handling Aquaduct's notes; (2) to collect and remit monthly payments of principal and interest; (3) to identify any delinquencies; (4) to manage escrow payments; (5) to issue IRS Form 1098 mortgage interest statements to debtors on which Gibraltar was identified as the "lender/recipient" of payments; and (6) to issue "payoff statements" upon request that stated the remaining balance on a note. There was no indication on the payoff statement that a full payment should be made to Aquaduct.

As the servicing agent, Gibraltar sent the McElhenies, and Aquaduct's other newly-acquired debtors, a coupon book and letter in May 1997. The letter stated that servicing of the McElhenie Note had been transferred to Gibraltar and directed the McElhenies to send their payments to Gibraltar and not to Millennium. The letter did not indicate that a full payment should be treated any differently from a regular monthly payment, and the record suggests this is the only payment instruction Aquaduct ever gave its debtors. The letter did not mention Aquaduct or state that Millennium no longer held the mortgage note. Young testified that Aquaduct authorized Gibraltar to send this letter and that Aquaduct never had any communication with the McElhenies or its other debtors.

Young also testified that he never gave Gilbraltar instructions on how to treat the events leading up to full payment on a note and did not tell Gibraltar it could not accept full payments until the summer

2000. Gibraltar provided Aquaduct with monthly statements that showed the amounts collected from each debtor. Aquaduct knew Gibraltar accepted full payment of the McElhenie Note because its own records for September 1998 show Gibraltar deposited $28,126.61 in the account it maintained for receivables on the McElhenie Note. A summary of accounts Gibraltar provided Aquaduct shows no balance owing on the McElhenie Note in November 1998. Aquaduct's records show that Gibraltar collected four full payments, including the McElhenie payment, over a span of two years before Aquaduct told Gibraltar (in summer 2000) that Gibraltar was not to accept full payments. From these facts, we conclude the evidence is legally sufficient to prove Gibraltar had implied actual authority to accept full payment of the McElhenie Note on behalf of Aquaduct.

In the interest of justice, we address Aquaduct's further argument that, under article three of the Uniform Commercial Code ("UCC"), Gibraltar could not have had authority to collect the loan payoff because the McElhenie Note was a negotiable instrument and Gibraltar did not have actual physical possession of the Note at the time of the full payment. *See* Tex. Bus. & Com.Code Ann. §§ 3.301, 3.602 (Vernon 2002). Aquaduct reasons because a negotiable instrument is paid only to the extent payment is made to a person entitled to enforce the instrument, and a person entitled to enforce the instrument is normally only a person in possession of the instrument, that the UCC did not allow the McElhenies to make their final payment to Gibraltar. *See id.* § 3.602 (providing a negotiable instrument is paid to the extent it is paid to a person entitled to enforce the instrument); *id.* § 3.301 (providing a holder of the instrument or a nonholder in possession of an instrument are persons entitled to enforce). Under Aquaduct's

construction, the UCC prohibits loan-servicing agreements, even for non-final payments, unless the principal transfers possession of the instrument to the servicing agent. *See id.* §§ 3.301, 3.602. Aquaduct's proposed interpretation of the UCC is untenable.

■ Unless displaced by the provisions of the UCC, agency law supplements the provisions of the UCC. Tex. Bus. & Com. Code Ann. § 1.103 (Vernon 1994). Common-law claims and principles complement the UCC to the extent they do not conflict with UCC provisions. *See Bryan v. Citizens Nat'l Bank,* 628 S.W.2d 761, 764 (Tex. 1982); *Bank One, Texas, N.A. v. Little,* 978 S.W.2d 272, 277 (Tex.App.-Fort Worth 1998, pet. denied). We find nothing in sections 3.301 and 3.602 of the Texas Business and Commerce Code that displaces the common-law agency principles at issue in this case. Accordingly, the McElhenies' final payment to Aquaduct's authorized agent, Gibraltar, is deemed to be payment to Aquaduct, a holder in possession of the negotiable instrument. *See Suarez,* 35 S.W.3d at 274. Although the parties have not cited a Texas case addressing this exact point, courts in at least two other jurisdictions where the UCC has been adopted have reached the same conclusion. *See* Tex. Bus. & Com.Code Ann. § 1.103(b)(3), *recodified at* Tex. Bus. & Com. Code Ann. § 1.103(a)(3) (effective Sept. 1, 2003) (providing the UCC must be applied and construed to make uniform law among jurisdictions); Tex. Gov't Code Ann. § 311.028 (Vernon 1998) ("A uniform act included in a code shall be construed to effect its general purpose to make uniform the law of those states that enact it"); *Skott v. Bank of Am. Ill.,* 266 Ga. 532, 468 S.E.2d 359, 360–61 (1996) (finding authority to accept mortgage payoff when agent authorized to collect payments as servicing agent and no limitations placed on that

authority); *United Mo. Bank v. Beard*, 877 S.W.2d 237, 239–40 (Mo.Ct.App.1994) (finding servicer had implied actual authority to accept prepayment of mortgage balance and holding principal who selected and authorized collecting agent should bear loss caused by absconding agent); *Tedesco v. Bekker*, 741 S.W.2d 896, 899 (Mo.Ct.App.1987) (finding express authority to collect full payment from broad language appointing servicer exclusive agent to manage loan and "collect all funds due"). Accordingly, we overrule Aquaduct's first and second issues.

**B. Did the trial court abuse its discretion by awarding North American attorney's fees under the Declaratory Judgments Act?**

■ In its third and fourth issues, Aquaduct argues the trial court's award of attorney's fees to North American was an abuse of discretion for two reasons: (1) because the counterclaim on which North American prevailed was a suit to clear title; and (2) because the award of attorney's fees was not equitable and just.

■■■ The Texas Declaratory Judgments Act provides that in any proceeding under the Act, the trial court may award costs as well as reasonable and necessary attorney's fees that are equitable and just. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997); *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex.1998). The trial court has broad discretion to determine whether to award costs and attorney's fees under the Act, and we will not reverse that judgment on appeal absent a clear showing of abuse. *Bocquet*, 972 S.W.2d at 20. We view the evidence in the light most favorable to the trial court's ruling and indulge every presumption in its favor. *Goebel v. Brandley*, 76 S.W.3d 652, 658 (Tex.App.-Houston [14th Dist.] 2002, no pet.). Whether the fees awarded are equitable and just is a matter of law. *Bocquet*, 972 S.W.2d at 21. It is an abuse of discretion for the trial court to rule arbitrarily, unreasonably, without regard to guiding legal principles, or without supporting evidence. *Id.*

The trial court awarded North American $16,000 in attorney's fees from Aquaduct because North American prevailed on its request for declaratory judgment. The trial court awarded an additional $5,000 in favor of North American in the event of appeal to the court of appeals and $5,000 for appeal to the Texas Supreme Court, both only payable should North American prevail. In its counterclaim for declaratory judgment, North American asked the trial court to declare that its lien had priority over Aquaduct's lien on the McIlhenies' property. A person interested under a deed or contract may have the trial court determine any question of validity or construction arising under the instrument and obtain a declaration of rights, status, or other legal relations thereunder. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.004(a) (Vernon 1997). The trial court construed and determined the validity of the instruments in this case, and it declared the rights, status, and legal relations thereunder.

Aquaduct essentially argues that North American's counterclaim is a trespass to try title suit in the guise of a request for declaratory relief. Appellant relies primarily on *Southwest Guaranty Trust Co. v. Hardy Road 13.4 Joint Venture*, in making this argument. 981 S.W.2d 951, 956 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). In *Southwest Guaranty*, the appellate court upheld the trial court's denial of attorney's fees under the Declaratory Judgments Act because cross-appellant's suit was for the purpose of clearing title. Appellant's reliance on *Southwest Guaranty* is misplaced because the case at bar

does not present the same question presented in *Southwest Guaranty*. Unlike the present case, in *Southwest Guaranty*, a landowner brought suit to clear title to its property, and the trial court rendered judgment declaring title quieted and removing, annulling, and holding for naught all clouds on title. *Id.* at 952–53, 957. In holding that the suit was really a trespass to try title suit, the court noted that the cross-appellant had not sought to construe any terms of the relevant lien or deed of trust in the trial court. *Id.* at 157. In the case at bar, the trial court determined the validity of competing instruments to settle a dispute between two purported lien holders, and its judgment did not declare title.

■ A trespass to try title action is a procedure by which competing claims to title or the right to possession of real property may be adjudicated. *See* Tex. Prop.Code Ann. § 22.001–22.045 (Vernon 2000); *Rogers v. Ricane Enter., Inc.*, 884 S.W.2d 763, 768 (Tex.1994). To recover in a trespass to try title action, the plaintiff must recover upon the strength of his own title. *Rogers*, 884 S.W.2d at 768. The plaintiff may recover (1) by proving a regular chain of conveyances from the sovereign; (2) by proving a superior title out of a common source; (3) by proving title by limitations; or (4) by proving prior possession, and that the possession has not been abandoned. *Id.* North American's requested relief, and the relief afforded by the trial court, are not the subject matter of a trespass to try title action. Because Aquaduct has not cited, and we have not found, any authority suggesting that superiority of liens is an improper subject for declaratory judgment, we overrule Aquaduct's third issue. *See Goebel*, 76 S.W.3d at 658.

■ In its fourth issue, Aquaduct maintains the award of attorney's fees is inequitable and unjust because neither North American nor Aquaduct engaged in culpable conduct. Aquaduct argues Gibraltar and North American's closing agent and title company, Old Republic, are responsible for this litigation. In Aquaduct's view, Gibraltar is culpable for having converted the funds, and Old Republic is blameworthy for its failure to require the original McElhenie Note or a release bearing the holder's signature before closing. In light of the trial court's finding, supported by the record, that the disputed payment was sent to an agent of Aquaduct—Gibraltar—we cannot say the trial court's award of attorney's fees is inequitable and unjust. Nothing in the lending documents Old Republic obtained named an entity other than Gibraltar as payee. The Missouri of Court of Appeals addressed the same equitable considerations and held that when payment is made to an authorized agent, the default of an agent is the responsibility of the principal. *United Mo. Bank*, 877 S.W.2d at 245. We agree. Aquaduct's conduct in allowing Gibraltar to collect full payments on its notes made the loss in this case possible, and Aquaduct may not shift this burden to a party who dealt with its agent. *See id.* Accordingly, we hold the trial court did not abuse its discretion in awarding attorney's fees to North American.

Having overruled all of Aquaduct's issues, we affirm the trial court's judgment.