

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00286-CV

———————————————

BENBROOK ECONOMIC DEVELOPMENT CORPORATION, Appellant

V.

THE NATIONAL BANK OF TEXAS, Appellee

On Appeal from the 67th District Court
Tarrant County, Texas
Trial Court No. 067-317774-20

Before Sudderth, C.J.; Kerr and Womack, JJ.
Opinion by Justice Kerr

## OPINION

## I. Introduction

Appellant Benbrook Economic Development Corporation (BEDC) is a subsequent purchaser of real property. Appellee The National Bank of Texas (NBT) holds the property's previous owner's promissory note and deed of trust, both given by a third party, as security for an unrelated loan.[1] After the previous owner defaulted on his loan with NBT, NBT filed for judicial foreclosure. BEDC and NBT then filed cross-motions for summary judgment on their respective rights to the property. The trial court overruled BEDC's objections to NBT's summary-judgment evidence, granted NBT's motion, and denied BEDC's motion. In a single issue briefed as multiple subissues, BEDC complains that the trial court's rulings were erroneous.

To be entitled to judicial foreclosure via summary judgment, the movant must prove that (1) a financial obligation—such as a promissory note—exists and that the movant has some privity to it; (2) a lien—such as a deed of trust—secures the financial obligation; (3) a default on the financial obligation has occurred; and (4) the property subject to the lien is the same property on which the movant seeks to enforce the lien. *See De La Garza v. Bank of N.Y. Mellon*, No. 02-17-00427-CV, 2018 WL 5725250, at *7 (Tex. App.—Fort Worth Nov. 1, 2018, no pet.) (mem. op.); *Mark v. Household Fin. Corp. III*, 296 S.W.3d 838, 839 (Tex. App.—Fort Worth 2009,

---

[1]The property passed through other hands before ultimately ending up with BEDC.

2

no pet.); *see also Rinard v. Bank of Am.*, 349 S.W.3d 148, 152 (Tex. App.—El Paso 2011, no pet.). Because the record contains a fact issue about whether the deed of trust on the property was discharged, the trial court erred by granting summary judgment in NBT's favor. Because the record also reflects that BEDC took ownership of the property with constructive notice of all the property's recorded liens and related instruments, summary judgment was not appropriate for BEDC either.

Accordingly, we reverse the trial court's judgment and remand the case for further proceedings.[2]

## II. Legal Background: Interplay of Texas Business and Commerce Code Chapters 3 and 9[3] with Real-Property Law

This case involves the interplay between two systems whose terminology we review up front: first, the UCC, which generally applies to contracts, personal property, and notes, and second, real-property law. *See* David Z. Conoly, *Foreclosure on a Collateral Transfer of Note & Lien*, 42 State Bar of Tex. Prof. Dev. Program, Advanced Real Estate Law Course 26, 26.1 (2020) (observing that when a collateral note itself is

---

[2]Based on our disposition here, we do not reach BEDC's evidentiary subissues. *See* Tex. R. App. P. 47.1 (requiring the court to hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal).

[3]The Uniform Commercial Code (UCC) identifies its chapters as "articles," while the Texas incorporation of the UCC in the Business and Commerce Code uses "chapters." For consistency, we will use "chapter" throughout.

secured by real property, "the separate worlds of real property Secured Transactions and personal property Secured Transactions each have a role in the transaction").

The property's original buyers, K&M Collision and its owners Michael and Elaine Admire, gave the property's original seller, John Franklin Campbell,[4] a purchase-money promissory note (the K&M note), a negotiable instrument under UCC Chapter 3.[5]

To secure that note, K&M Collision gave Campbell a vendor's lien. A purchase-money vendor's lien is "a charge imposed by contract to secure payment of the purchase price of real property." *XTO Energy, Inc. v. EOG Res., Inc.*, 554 S.W.3d 127, 138 (Tex. App.—San Antonio 2018, pet. granted, judgm't vacated and remanded by agr.) (quoting *Glenn v. Lucas*, 376 S.W.3d 268, 275 (Tex. App.—Texarkana 2012, no pet.)). Under a vendor's lien, "legal title does not pass to the vendee. A vendee owns the equitable interest along with a contract for the purchase of land." *Flag-Redfern Oil Co. v. Humble Expl. Co.*, 744 S.W.2d 6, 8 (Tex. 1987); *see Disanti v. Wachovia Bank, NA*, No. 2-08-330-CV, 2009 WL 1372970, at *3 (Tex. App.—Fort Worth May 14, 2009,

---

[4]Campbell signed various documents in various capacities. We will collectively refer to him as "Campbell" because capacity was not argued in the trial court.

[5]To be "negotiable" under UCC Chapter 3, an instrument must be an unconditional promise to pay a fixed amount of money on demand or at a definite time, must not contain additional undertakings by the obligor, and must be payable to bearer or to order when first issued. Adam J. Levitin, *The Paper Chase: Securitization, Foreclosure, and the Uncertainty of Mortgage Title*, 63 Duke L.J. 637, 655–56 (2013); *see generally* Tex. Bus. & Com. Code Ann. §§ 3.102(a), .104(a), .106.

no pet.) (mem. op.). "When an express vendor's lien is retained to secure unpaid purchase money, the vendor holds superior title, and the vendee has a mere equitable right to acquire title by carrying out the agreement." *Dominey v. Unknown Heirs & Legal Representatives of Lokomski*, 172 S.W.3d 67, 73 (Tex. App.—Fort Worth 2005, no pet.). The purchase contract "is treated as executory between the vendor and vendee and those holding under them until the purchase money [obligation] is fully satisfied." *Glenn*, 376 S.W.3d at 275 (quoting *Bunn v. City of Laredo*, 245 S.W. 426, 429 (Tex. Comm'n App. 1922, judgm't adopted)).

Also to secure its note, K&M Collision gave Campbell a deed of trust. A deed of trust "is a mortgage with a power to sell on default. It is a conveyance of real property in trust by way of security, defeasible or redeemable at any time prior to the sale of the property." 30 Tex. Jur. 3d *Deeds of Trust and Mortgages* § 2 (2022) (footnotes omitted); *see Johnson v. Snell*, 504 S.W.2d 397, 399 (Tex. 1973); *see also Fin. Freedom Sr. Funding Corp. v. Horrocks*, 294 S.W.3d 749, 755 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("The purpose of a deed of trust is to secure to a lender the repayment of a borrower's debt."). "When a mortgagor executes a deed of trust[,] the legal and equitable estates in the property are severed," and the mortgagor retains legal title while the mortgagee holds the equitable title. *Flag-Redfern*, 744 S.W.2d at 8.

Campbell used the K&M note and deed of trust as collateral to secure a large unrelated promissory note that he gave to Pinnacle Bank in exchange for a loan. Pinnacle later assigned its interest in the K&M note and related documents to NBT as

5

part of Campbell's collateral to secure NBT's even larger (but also unrelated) promissory note from Campbell. Campbell's promissory note to NBT was a UCC Chapter 3 negotiable instrument.

UCC Chapter 3, which applies only to negotiable instruments, is generally thought of as "payment system" law—but it is also property law for certain payment and debt instruments, including mortgages, "because of the common-law doctrine providing that 'the mortgage follows the note,' meaning that a transfer of the note effectuates a transfer of the associated security interest." Levitin, 63 Duke L.J. at 653, 655. UCC Chapter 3 provides a method for transferring negotiable instruments: if an instrument is payable to bearer, delivery alone will suffice for negotiation; if the instrument is payable to the order of an identified person, then negotiation requires not only delivery but also indorsement by the prior holder, which gives the transferee all the transferor's rights to enforce the instrument. *Id.* at 657–58 (citing UCC §§ 3.201, .203–.205).

UCC Chapter 9, on the other hand, governs security interests and contains a mechanism for transferring both promissory notes and mortgages. *Id.* at 676, 690–91 (referencing UCC § 9.203(g)). But UCC Chapter 9 says nothing about note enforcement, leaving that to UCC Chapter 3.[6] *Id.* at 699–700. Under UCC Chapter 3,

---

[6]NBT argues that the UCC "simply does not apply to interests in and liens on real property." But "[i]ssues relating to the transfer, ownership, and enforcement of mortgage notes" are affected by UCC Chapter 3 when the mortgage note is a negotiable instrument and by UCC Chapter 9 when addressing transfer of note

an instrument is paid to the extent payment is made by or on behalf of a party obliged to pay the instrument and to a person entitled to enforce the instrument. Tex. Bus. & Com. Code Ann. § 3.602(a). It can also be paid to a person formerly entitled to enforce the note, but only if at the time of the payment, the party obliged to pay has not been adequately notified both that the note has been transferred and that payment is to be made to the transferee. *See id.* § 3.602(b). A notification is "adequate" only if it is signed by the transferor or the transferee, reasonably identifies the transferred note, and provides an address at which future payments are to be made. *Id.*

Although UCC Chapter 9's scope does not generally apply to "the creation or transfer of an interest in or lien on real property," one exception to this general rule is for "liens on real property in Sections 9.203 and 9.308." *Id.* § 9.109(d)(11)(A). Section 9.203 provides that a security interest attaches to collateral when it becomes

---

ownership and the transferee's right, "under certain circumstances, to record its interest in the mortgage in the applicable real estate recording office." Permanent Editorial Bd. for the Unif. Commercial Code, *Report of the Permanent Editorial Board for the Uniform Commercial Code: Application of the Uniform Commercial Code to Selected Issues Relating to Mortgage Notes* 2 (2011), https://www.ali.org/media/filer_public/ 1a/10/1a103e01-5bbe-4d2e-a65c-c766b7b2b054/peb_report_-_november_2011.pdf (UCC Board). *Compare* Tex. Bus. & Com. Code Ann. § 9.101 cmt. 1 (stating that UCC Chapter 9 "provides a comprehensive scheme for the regulation of security interests in personal property and fixtures"), *with id.* cmt. 4.a. (stating that UCC Chapter 9 "also addresses explicitly . . . any property (including real property) that secures a right to payment or performance that is subject to an Article 9 security interest," and referencing Sections 9.203 and 9.308), *and id.* § 9.109(d)(11) (setting out certain exceptions to the UCC's general statement that Chapter 9 "does not apply to . . . the creation or transfer of an interest in or lien on real property . . . as defined by Section 64.001, Property Code").

enforceable against the debtor with respect to the collateral, and that it is enforceable against the debtor and third parties if value has been given, the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party, and, among other things, the debtor has authenticated a security agreement that describes the collateral. *Id.* § 9.203(a), (b)(1)–(3)(A). "The attachment of a security interest in a right to payment or performance secured by a security interest or other lien on personal or real property is also attachment of a security interest in the security interest, mortgage, or other lien." *Id.* § 9.203(g); *see id.* § 9.203 cmt. 9 ("Subsection (g) codifies the common-law rule that a transfer of an obligation secured by a security interest or other lien on personal or real property also transfers the security interest or lien."); *see also* Conoly, 42 State Bar of Tex. Prof. Dev. Program, Advanced Real Estate Law Course, at 26.5 (explaining that foreclosure of a collateral note under a collateral transfer is governed by the Texas Business and Commerce Code rather than by the Texas Property Code but also noting that when the collateral note is a note secured by a deed-of-trust lien on real property, the underlying real property is the primary source of security and the collateral note security "is merely a means of reaching the real property").

UCC Chapter 9 defines "mortgage" as a "consensual interest in real property, including fixtures, that secures payment or performance of an obligation," Tex. Bus. & Com. Code Ann. § 9.102(a)(55), and "encumbrance" as "a right, other than an ownership interest, in real property," including mortgages and other liens on real

8

property, *see id.* § 9.102(a)(32). "Issues concerning mortgages under Chapter 9 arise in the context of priority conflicts between a security interest created under Chapter 9 and an interest in the same collateral created by a mortgage." 2 Vernon's Tex. Code Forms Anno., UCC Forms § 9.102(a)(55) (4th ed. 2021).

> The following illustrates how the UCC can overlap with real-property law:

> Maker issued a mortgage note payable to the order of Payee. Payee borrowed money from Funder and, to secure Payee's repayment obligation, Payee and Funder agreed that Funder would have a security interest in the note. Simultaneously with the funding of the loan, Payee gave possession of the note to Funder. Funder has an attached and enforceable security interest in the note. UCC § 9.203(b). This is the case even if Payee's agreement is oral or otherwise not evidenced by an authenticated record. Payee is no longer a person entitled to enforce the note (because Payee is no longer in possession of it and it has not been lost, stolen, or destroyed). UCC § 3.301. Funder is a person entitled to enforce the note if either (i) Payee indorsed the note by blank indorsement or by a special indorsement identifying Funder as the person to whom the indorsement makes the note payable (because, in such cases, Funder would be the holder of the note), or (ii) the delivery of the note from Payee to Funder constitutes a transfer of the note under UCC § 3.203 (because, in such case, Funder would be a nonholder in possession of the note with the rights of a holder).

UCC Board, *supra* n.6, at 10–11 (footnote omitted).[7]

With these terms and the relevant statutory scheme in mind, we turn to the facts.

---

[7]This example does not address the interplay between state law on agency and UCC Chapter 9, the significance of which we address later.

## III. Background

### A. Factual History[8]

*Campbell's 2011 sale to K&M Collision.* On January 1, 2011, Campbell issued a warranty deed with vendor's lien to K&M Collision and the Admires in exchange for a $674,644.16 promissory note "secured by a first and superior vendor's lien and superior title retained in this deed and by a first-lien deed of trust." The deed was recorded in the county real-property records on June 1, 2011. Campbell was identified as K&M Collision's lender in the January 1, 2011 deed of trust, which defined "lender" as including "any mortgage servicer for Lender." The deed of trust was recorded in the real-property records, also on June 1, 2011. *See* Tex. Prop. Code Ann. § 13.002(1).

*Pinnacle's 2012 loan to Campbell.* A little over a year later, in August 2012, Campbell used the deed of trust and other documents to secure an unrelated $225,000 loan from Pinnacle.[9] In doing so, he executed a "Collateral Assignment of Beneficial Interest in Deed of Trust/Mortgage and Collateral Documents."[10] The

---

[8]The documents and facts we discuss are all in the summary-judgment record.

[9]The loan was made on behalf of Campbell himself; his trust; and his companies Falcon 206 Exploration Sales and Leasing LLC and Campbell's Auto Body, Inc.

[10]When a note's payee seeks to use the note as collateral or to sell the note outright, UCC Chapter 9 "governs that transaction and determines whether the creditor or buyer has obtained a property right in the note." UCC Board, *supra* n.6, at 8. The sold right to payment is designated "collateral." *Id.* at 9. To create a "security

collateral assignment referenced the K&M note and prohibited Campbell from modifying any collateral loan—that is, the K&M note—or collateral-loan documents without Pinnacle's prior written consent. It also stated that Campbell, as pledgor,

> hereby collaterally assigns, transfers, conveys, sets over, and pledges to [Pinnacle], and grants to [Pinnacle] a security interest in, all Pledgor's right, title and interest in the Collateral Loan and the Collateral Loan Documents. This Assignment is made pursuant to, and the assignments made herein are further evidenced by, a certain Collateral Assignment and Security Agreement (Promissory Notes and Collateral Documents) dated even date herewith . . . . The assignment of Pledgor's interests to [Pinnacle] shall remain in full force and effect, and shall be upon all other persons and entities unless and until a release of this Agreement has been executed and filed of record by [Pinnacle].

The assignment also said:

> For purposes of clarification, notwithstanding anything to the contrary contained in this Assignment or the aforementioned assignment described in the Collateral Documents Assignment, the assignment is not and shall not be construed as an absolute assignment; rather, it is intended to be a collateral assignment for the purpose of granting Lender a security interest in the Collateral Loan and the Collateral Loan Documents.

*Compare* Tex. Bus. & Com. Code Ann. § 3.302(e) (limiting recovery of holder in due course who possesses only a security interest in a negotiable instrument), *with id.* § 9.604(a) (stating that if a security agreement covers both personal and real property, the secured party may proceed against the personal property without prejudicing any

---

interest" in either the note securing an obligation or the outright sale of the note: (1) value must be given; (2) the seller must have rights in the note or the power to transfer rights in the note to a third party; and (3) either the seller must authenticate a security agreement that describes the note or the secured party must take possession of the note in accordance with the seller's security agreement. *Id.*

rights with respect to the real property, or against both personal and real property "in accordance with the rights with respect to the real property").

The assignment was recorded on September 11, 2012.

*Pinnacle's 2015 assignment to NBT; NBT's loan to Campbell.* Three years later, Pinnacle assigned its interests to NBT as security for NBT's unrelated $750,000 loan to Campbell.[11] The assignments were recorded on November 25, 2015. The K&M note was additionally marked, "Pay to the order of the National Bank of Texas in accordance with Collateral Assignment of Beneficial Interest in Deed of Trust/Mortgage and Collateral Documents dated August 17, 2012," and it was signed by a Pinnacle branch president. NBT took physical possession of the promissory note. The "Assignment and Transfer of Deed of Trust and Lien, Guaranty and Miscellaneous Documents" stated that Pinnacle, as "Holder of the Note, Deed of Trust and lien[,] sells, transfers, conveys and assigns the Note, Deed of Trust, lien, Guaranties and all supporting documentation and the COLLATERAL ASSIGNMENT OF BENEFICIAL INTEREST IN DEED OF TRUST/MORTGAGE AND COLLATERAL DOCUMENTS, (collectively 'Loan Documents') to [NBT]."

---

[11]The record does not indicate whether Pinnacle was repaid out of the NBT loan proceeds, but Pinnacle is not a party and its interests have not been raised by the parties.

12

Campbell also signed a "Commercial Pledge Agreement" in connection with the NBT loan transaction in which he granted NBT a security interest in collateral to secure his note, agreed that NBT would have the rights stated in the agreement regarding the collateral, and identified the collateral as Campbell's

> present and future rights, title and interest in and to the following described investment property, together with any and all present and future additions thereto, substitutions therefor, and replacements thereof, and further together with all income and proceeds as described herein: ASSIGNMENT OF NOTE RECEIVABLE DATED JANUARY 1, 2011 FROM K&M COLLISION . . . AND [THE ADMIRES] IN THE ORIGINAL AMOUNT OF $674,644.16.

In the pledge agreement, Campbell warranted to NBT that, among other things, he would not sell, transfer, encumber, or otherwise dispose of any of his rights in the collateral except as provided by the agreement; that "[t]o the extent the Collateral consists of promissory notes or other instruments, as defined by the [UCC], the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution"; and that NBT could file a UCC financing statement or a copy of the agreement to perfect its security interest. Campbell also agreed to immediately deliver to NBT all income and proceeds from the collateral. If Campbell defaulted, NBT could (among other remedies) sell the collateral "at one or more public or private sales" or "maintain a judicial suit for foreclosure and sale of" the collateral. In addition, the agreement defined "related documents"—with which Campbell also had to comply—to include "all promissory notes, credit agreements,

13

loan agreements, . . . security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the indebtedness."

*K&M Collision's 2016 sale to JS & TA Properties.* Not quite another full year passed before K&M Collision decided to sell the property to JS & TA Properties, LLC (JS&TA), in a transaction effective June 16, 2016. Around that time, Campbell owed NBT $667,237.37.

Before the property's transfer to JS&TA, Brittaney Siciliano, an officer of Republic Title, exchanged emails with Campbell in early June about the K&M note's payoff amount,[12] which he told her would be $600,090.61, plus $3,000.45 in interest for that month, divided by 30 days, to amount to $100.01 per day.[13] Republic Title

---

[12]Under Property Code Section 12.017, a title insurance company may request a "payoff statement" for a mortgage on nonresidential property with an original face amount of indebtedness of less than $1.5 million. Tex. Prop. Code Ann. § 12.017(a)(5), (b). A "payoff statement" is a statement of the amount of "the unpaid balance of a loan secured by a mortgage, including principal, interest, and other charges properly assessed under the loan documentation of the mortgage; and interest on a per diem basis for the unpaid balance." *Id.* § 12.017(a)(5)(A)–(B). A person transmitting a payoff statement is considered the "mortgage servicer"—"the last person to whom a mortgagor has been instructed by a mortgagee to send payments for the loan secured by a mortgage"—for the mortgage described in the payoff statement. *Id.* § 12.017(a)(3); *see also id.* § 51.0001(3) (defining "mortgage servicer" as "the last person to whom a mortgagor has been instructed by the current mortgagee to send payments for the debt secured by a security instrument" and stating that a mortgagee may be the mortgage servicer).

[13]Campbell had previously emailed Meagan Kendrick, Siciliano's sister and Republic Title coworker, in response to Kendrick's May 2016 query about payoff

14

business records show that on May 25, 2016, Siciliano had asked a legal assistant to prepare a release of lien and that an initial draft was prepared for NBT to sign as the current owner and holder of the debt and lien securing the 2011 deed of trust that had been assigned to it from Pinnacle. Siciliano later asked the legal assistant to revise the release of lien to reflect release of Campbell's—not NBT's—interest,[14] and a new draft was created showing Campbell as the current owner and holder of the debt and lien and omitting any information about or reference to Pinnacle and NBT. Republic Title's records showed that it knew of the assignments from Campbell to Pinnacle and then to NBT, but they also showed that K&M Collision's owners had been paying Campbell on the note.[15] Siciliano notarized the June 16, 2016 "general warranty deed with vendor's lien (2nd vendor's lien)" from K&M Collision to JS&TA, and it was recorded several days later.

---

figures for the K&M Collision sale. In that email, he told her, "The payoff on 5-1-2016 was $601,429.61" with daily interest of $97 per day.

[14]Siciliano's June 16 email read, "Release should be signed by John Franklin Campbell, IV, as Trustee for the John Franklin Campbell IV Living Trust. That is who we are paying off. Can you revise please?"

[15]From the record, it does not appear that K&M Collision ever knew about Campbell's assignments. Until Republic Title sent K&M Collision the payoff statement, Campbell had apparently been the "last person to whom [K&M Collision] [was] instructed by [Campbell] to send payments for a debt secured by a security instrument," and thus Campbell had arguably been K&M Collision's mortgage servicer. *See* Tex. Prop. Code Ann. §§ 12.017(a)(3), 51.0001(3).

15

The June 17, 2016 Republic Title seller's settlement statement shows that out of the $740,000 sales price paid to K&M Collision, Campbell received $601,790.78 by wire transfer. Campbell executed a "full release of lien" on December 16, 2016, that was filed on January 10, 2017. In that release, Campbell represented that he was the current owner and holder of the K&M note, lien, and deed of trust and that he released and discharged "any and all other liens and security interests securing said indebtedness" in consideration of the full and final payment of the note.[16]

*Campbell's eventual loan default; JS&TA's 2019 sale to BEDC.* In November 2017, NBT renewed Campbell's loan; Campbell's associated promissory note, now for $649,995.48, again listed as collateral the assignment of the 2011 K&M note—the payoff of which Campbell had surreptitiously pocketed in 2016—as well as a security agreement on his private plane. Campbell's note to NBT went into default by its terms at maturity in December 2018.

Shortly afterward, and for unexplained reasons, another release of lien on the K&M note was recorded, on January 9, 2019. Although not filed until that day, this release was dated June 17, 2016, and signed by Campbell. In the paragraph defining the "debt and lien" that Campbell was the "current owner and holder of" and that he was releasing, both Pinnacle's and NBT's interests were referred to:

---

[16]A different release, which referred to Pinnacle and NBT and which Campbell had apparently signed on June 17, 2016, was recorded some two years later, as we note below.

Deed of Trust securing a promissory note filed 06/01/2011, recorded in cc# D211128939, Real Property Records, Tarrant County, Texas, is assigned from Pinnacle Bank, to National Bank of Texas, by instrument filed 11/25/2015, recorded in cc# D215265229, Real Property Records, Tarrant County, Texas; however no assignment to Pinnacle Bank is found of record. Company requires recorded assignment, or John Franklin Campbell IV, as Trustee for the John Franklin Campbell IV Living Trust under an instrument dated March 24, 2003, recorded in the Real Property Records of Johnson County, Texas, and Pinnacle Bank need to release lien. Said note and lien collaterally assigned to: PINNACLE BANK, a Texas banking corporation, by instrument filed 09/11/2012, recorded in cc# D212222286, Real Property Records, Tarrant County, Texas. Assignment and Transfer of Deed of Trust and Lien, Guaranty and Miscellaneous Documents, assigned to NATIONAL BANK OF TEXAS, by instrument filed 11/25/2015, recorded in cc# D215265230, Real Property Records, Tarrant County, Texas.

A few months later, JS&TA transferred the property to BEDC through a special warranty deed that was recorded in April 2019. The business records of WFG National Title Company, the underwriter for McKnight Title, which handled that sale, identified not only the recorded assignments to Pinnacle and to NBT, but also both versions of Campbell's recorded releases.[17]

## B. Procedural History

NBT initially sued the City of Benbrook and Campbell (individually and in his trustee status), seeking to judicially foreclose on the property and to recover for the unpaid principal balance that Campbell owed on his 2017 promissory note. Campbell filed for bankruptcy, and in its first amended petition, NBT dropped Campbell individually but kept him in the suit in his trustee status and amended its pleading to sue BEDC rather than the City of Benbrook. NBT later added Republic Title as a defendant; added a request for a declaratory judgment that Campbell's December 16,

---

[17]Coincidentally, Kendrick was then working at McKnight Title.

2016 release of lien was void; alleged that there had been a fraudulent closing by Republic Title; and sought recovery for, among other things, tortious interference with contract, breach of fiduciary duty, and fraud by nondisclosure as to Republic Title.

BEDC answered with a general denial and several affirmative defenses, including that the deed of trust had been extinguished by payment of the underlying obligation and that it lacked actual or constructive notice of NBT's claims.

*BEDC's Motion for Summary Judgment.* BEDC filed a traditional summary-judgment motion, arguing that NBT's judicial-foreclosure claim failed as a matter of law because the deed of trust had been automatically extinguished in 2016 when K&M Collision paid the K&M note in full. Among BEDC's summary-judgment evidence were the documents showing that NBT had received an assignment of only a collateral interest in the 2011 K&M note and deed of trust, Siciliano's and Campbell's June 2016 email exchange about the payoff amount to Campbell,[18] the Republic Title seller's settlement statement reflecting "payoff loan" to Campbell, an email receipt regarding the wire transfer of $601,790.78 to Campbell at

---

[18]Kendrick and Campbell's May 2016 email exchange about the payoff amount to Campbell was included in NBT's summary-judgment evidence. When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary-judgment evidence and determine all questions presented. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We should then—if possible—render the judgment that the trial court should have rendered. *See Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009); *Mann Frankfort*, 289 S.W.3d at 848.

E-Trade Bank, and Campbell's December 2016 "Full Release of Lien," which made no mention of Pinnacle or NBT.

In its response to BEDC's summary-judgment motion, NBT complained that BEDC had not explained how Campbell had the authority to execute a release of NBT's lien, argued that an issue existed about whether the proper party was paid in the 2016 sales transaction, and pointed out a disparity between the release of lien that Campbell had signed in June 2016 (recorded in 2019) and the release he signed in December 2016 (recorded in 2017). NBT argued that BEDC was charged with constructive notice of NBT's lien, that a release was required from NBT, and that Republic Title had taken no steps to obtain a release from NBT. NBT incorporated by reference its own summary-judgment motion, discussed below, and the evidence attached to that motion.

Replying to NBT's summary-judgment response, BEDC argued that NBT's and Campbell's rights to receive the payoff were exclusively governed by the terms of the K&M note, NBT's collateral pledge agreement with Campbell, and NBT's recorded assignment of Pinnacle Bank's collateral interest, and that NBT had brought forward no admissible evidence to support its judicial-foreclosure claim.

*NBT's Cross-Motion for Summary Judgment.* NBT filed a cross-motion for summary judgment, arguing that it was entitled to judgment as a matter of law on the amount of its lien against the property and to a declaration that Campbell's

purported December 16, 2016 release filed in January 2017 was void.[19] Although NBT's summary-judgment evidence was voluminous,[20] we note only those items pertinent to our disposition of this appeal on the issue of BEDC's notice of NBT's interest:

- A certified copy of the 2011 K&M deed of trust.

- The August 17, 2012 "Collateral Assignment of Beneficial Interest in Deed of Trust/Mortgage and Collateral Documents" between Campbell and Pinnacle, recorded on September 11, 2012.

- The November 20, 2015 assignment of lien and 2011 K&M deed of trust from Pinnacle, as "Holder of Note, Deed of Trust and Lien," to NBT, recorded on November 25, 2015.

- The November 20, 2015 "Assignment and Transfer of Deed of Trust and Lien, Guaranty and Miscellaneous Documents" from Pinnacle to NBT, referencing the K&M note and deed of trust and recorded on November 25, 2015.

- Campbell's December 16, 2016 release of lien, recorded on January 10, 2017.

---

[19]NBT's motion did not state any specific summary-judgment grounds. Although it is fundamental that a summary-judgment motion must stand or fall on the grounds it specifically and expressly sets forth and reliance may not be placed on summary-judgment evidence for such grounds, *see McConnell v. Southside ISD*, 858 S.W.2d 337, 339, 341 (Tex. 1993), BEDC did not brief this subissue on appeal.

[20]Among other things, NBT attached excerpts from the February 11, 2020 depositions of Siciliano and Kendrick and from Campbell's February 28, 2020 sworn statement. Because we do not reach BEDC's complaints about Siciliano's and Kendrick's depositions, *see supra* n.2, we mention only that both Siciliano and Kendrick testified that they recalled nothing about the 2016 Republic Title transaction. Likewise, because we do not reach BEDC's objection to Campbell's sworn statement, we do not go into his testimony except to say that he claimed to have relied on Republic Title to tell him what was needed for the 2016 transaction.

- Campbell's June 17, 2016 release of lien, recorded on January 9, 2019.[21]

BEDC filed a response to NBT's motion in which it incorporated its summary-judgment motion by reference, as well as all admissible summary-judgment evidence in the record. It argued that the payment to Campbell extinguished the deed-of-trust lien, barring NBT's judicial-foreclosure claim as a matter of law.

In a reply brief, NBT argued that BEDC had failed to identify any evidence to show that Campbell's December 2016 release of lien was not void or to show that Campbell was NBT's agent for payoff or any other purpose.[22] NBT asserted that the evidence showed that at the time of the 2016 payoff, it owned a deed of trust and a vendor's lien on the property and had physical possession of the K&M note and that

---

[21]NBT also attached a title search of all grantees on the property's current deed run by Republic Title on May 17, 2016. Those records showed the transfer of a warranty deed from Campbell to K&M Collision and Campbell's Auto Body Benbrook on June 1, 2011; the transfer of "COLL ASG/TFR" from Campbell (as well as Falcon 206 and Campbell's Auto Body Inc.) to Pinnacle Bank on September 11, 2012; and K&M Collision's owners, K&M Collision, and Pinnacle Bank's transfers of "ASGMT LIEN" to NBT on November 25, 2015.

[22]A trial court cannot grant summary judgment on grounds not presented in the summary-judgment motion. *See* Tex. R. Civ. P. 166a(c); *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011); *see also State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010) (stating that a "[s]ummary judgment may not be affirmed on appeal on a ground not presented to the trial court in the motion"). New grounds for summary judgment asserted by a movant in a reply brief are not properly considered on appeal. *Atmos Energy Corp. v. Paul*, 598 S.W.3d 431, 467 (Tex. App.—Fort Worth 2020, no pet.); *see Yeske v. Piazza Del Arte, Inc.*, 513 S.W.3d 652, 677 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (stating that a summary-judgment movant may not use its reply brief to amend its motion or to raise new and independent summary-judgment grounds).

the chain of title put BEDC on both constructive notice to inquire about the rights of other parties in the property being conveyed and actual notice through McKnight Title's acting as WFG's agent in the 2019 JS&TA/BEDC transaction.

*Trial Court's Orders.* The trial court denied BEDC's motion and granted NBT's, stating that Campbell owed NBT $789,721.94 as of March 26, 2020; declaring void the December 16, 2016 release of lien recorded on January 10, 2017; and granting NBT's request for judicial foreclosure on the property. The trial court severed NBT's claims against BEDC to make the summary-judgment order final and appealable.

## IV. Discussion

BEDC complains that the trial court erred by granting summary judgment for NBT, claiming that its evidence shows that the deed of trust held by NBT was extinguished as a matter of law. NBT disagrees, contending that the deed of trust was not extinguished and that BEDC purchased the property with notice. We begin with the question of notice.

## A. BEDC had notice.

Under Property Code Section 13.001, a conveyance of real property or a mortgage or deed of trust is void as to a subsequent purchaser for valuable consideration who lacks notice of it "unless [it] has been acknowledged, sworn to, or proved and filed for record as required by law." Tex. Prop. Code Ann. § 13.001; *Broadway Nat'l Bank, Tr. of Mary Frances Evers Tr. v. Yates Energy Corp.*, 631 S.W.3d 16,

22

26 (Tex. 2021). An instrument that is properly recorded in the proper county is notice to all persons of the instrument's existence. Tex. Prop. Code Ann. § 13.002(1); *Bank of Am. v. Babu*, 340 S.W.3d 917, 923 (Tex. App.—Dallas 2011, pet. denied) ("A party has constructive notice of instruments properly recorded in the proper county."); 3 Aloysius A. Leopold, *Texas Practice Series: Land Titles And Title Examination* § 8.3 (3d ed. 2021) ("The primary purpose of the recording statutes, which require the registration of deeds and other instruments affecting interests in land,[] is to give notice of the contents[] of the recorded instruments.").

A bona fide purchaser is one who acquires property in good faith, for value, and without notice—constructive or actual—of any third-party claim or interest. *Broadway Nat'l Bank*, 631 S.W.3d at 26. Constructive notice may create an irrebuttable presumption of actual notice in some circumstances, and recorded instruments in a grantee's chain of title generally establish an irrebuttable presumption of notice. *Trinity Fin. Servs., LLC v. Mahanay*, No. 02-21-00027-CV, 2022 WL 247433, at *3–4, *6 n.3 (Tex. App.—Fort Worth Jan. 27, 2022, no pet. h.) (mem. op.) (expressly declining to hold that a lien's validity factors into whether there is constructive notice of it).[23]

---

[23]We recently discussed deeds of trust in *Mahanay*, in which a property owner took out a loan and signed a promissory note and deed of trust, which were then assigned to other financial institutions—first to Credit Union of Texas (CUTX) and then to Companion Property and Casualty Insurance (CPCI)—and recorded in the county real-property records. 2022 WL 247433, at *1. When the owner sold the property, the title commitment specifically identified that the property was

The party claiming bona-fide-purchaser status has the burden to prove the defense, and it is well settled that a purchaser is bound by every recital, reference, and reservation contained in or fairly disclosed by any instrument that forms an essential link in the chain of title under which he claims. *Id.* at *3–4. Any description, recital of fact, or reference to other documents in an instrument puts the purchaser on inquiry, and he is bound to follow up this inquiry, step by step, from one discovery to another and from one instrument to another, until the whole series of title deeds is exhausted and a complete knowledge of all matters referred to and affecting the estate is obtained. *Id.* at *4.

The record reflects that BEDC had constructive—if not actual—notice of NBT's interest in the property, including the recording of Pinnacle's assignment to NBT and the two unidentical releases of lien purporting to relinquish Campbell's interests—with the second release recorded just four months before BEDC bought the property and explicitly referring to both the Pinnacle and NBT assignments. *See*

---

encumbered by a lien as reflected in the county real-property records. *Id.* The owner told the buyers' title agent that the note and lien had been paid off in 2009, provided the title agent with CUTX's contact information, and encouraged the buyers to verify the status of the note and lien. *Id.* CUTX confirmed to the buyers' title agent that the seller had paid the note's full amount in 2009 and that it should have recorded a release of lien at that time, and it filed a release of lien in July 2014. *Id.* When Trinity came into possession of the note and deed of trust, it attempted to foreclose on the property in 2019. *Id.* We held that whether the lien had been extinguished was irrelevant to the buyers' bona-fide-purchaser defense (which failed because they were on notice due to the real property records) and that the buyers were "free to prove th[e] vital fact [of extinguishment] regardless of the bona fide purchaser defense" on remand. *Id.* at *6–7.

24

*Broadway Nat'l Bank*, 631 S.W.3d at 26 (defining a bona fide purchaser as one who acquired property in good faith, for value, and "without notice of *any* third-party claim or interest" (emphasis added)). Accordingly, we must now consider whether a genuine, material fact issue exists with regard to NBT's interest that might preclude summary judgment in its favor.

## B. NBT's lien might have been extinguished.

Campbell issued a warranty deed with vendor's lien to K&M Collision in exchange for the K&M note—a note secured both by the vendor's lien and by a deed of trust.[24] Campbell then used the K&M note and deed of trust to secure unrelated loans, first from Pinnacle and then from NBT. NBT argues that the 2012 and 2015 assignments plainly indicate that it held the deed-of-trust lien, and we agree. But nothing in the summary-judgment record shows that Pinnacle or NBT was ever identified as K&M Collision's loan servicer on the note that the deed of trust secured. Instead, the record tangentially reflects through Republic Title emails that Campbell had continued to collect loan payments on the K&M note from K&M Collision's owners.

Payoff of the K&M note extinguished the vendor's lien and the deed of trust. *Southland Life Ins. Co. v. Barrett*, 172 S.W.2d 997, 1000 (Tex. App.—Fort Worth 1943,

---

[24]Under UCC Chapter 3, K&M Collision, the note's maker, was obliged to pay the amount of the note to the person entitled to enforce the note and such payment would result in a discharge of K&M Collision's obligation on the note. *See* Tex. Bus. & Com. Code Ann. §§ 3.103(b), .203, .301, .412, .602; UCC Board, *supra* n.6, at 4.

writ ref'd w.o.m.); *see Caress v. Lira*, 330 S.W.3d 363, 366 (Tex. App.—San Antonio 2010, pet. denied) ("A lien is usually extinguished upon payment of the indebtedness that it was created to secure."); *see also Jarvis v. K & E Re One, LLC*, 390 S.W.3d 631, 642 (Tex. App.—Dallas 2012, no pet.) ("When Stewart Title forwarded the loan payoff funds to NAC, the Jarvises' agent with authority to accept the funds, the lien on the property was extinguished and the [deed of trust] was discharged."); *Am. First Nat'l Bank v. Jordan-Lewis Dev., L.P.*, No. 01-09-00990-CV, 2011 WL 2732779, at *5 (Tex. App.—Houston [1st Dist.] July 14, 2011, no pet.) (mem. op.). This is because "[a] mortgage can have no legal effect apart from [the] debt or obligation it is designed to secure, and the mortgage thus ceases to exist on payment of the underlying debt." 1 W. Mike Baggett and Brian Thompson Morris, *Texas Practice Guide: Real Estate Litig.* § 4:89 (2022); *see* 2 James N. Johnson, *Texas Practice Guide: Real Trans.* § 10:94 (2021) ("The lien of a mortgage or trust deed is extinguished or discharged when satisfaction of the note evidencing the debt secured by the mortgage occurs."). *But see Russell & Seisfeld v. Kirkbride*, 62 Tex. 455, 456–57 (1884) (noting that if a property's seller has transferred notes given to secure purchase money, he could not be permitted "to destroy the security which may constitute the sole or chief value of the note or notes transferred"); *Myers v. Crenshaw*, 116 S.W.2d 1125, 1129 (Tex. App.—Texarkana 1938) (stating that purchase-money note's assignee has no right to rescission; rather his sole right is to have the land sold and proceeds applied to satisfy his purchase-money note), *aff'd*, 137 S.W.2d 7 (Tex. [Comm'n App.] 1940).

Further, unless otherwise displaced by UCC provisions, agency law supplements the UCC. *Aquaduct, L.L.C. v. McElhenie*, 116 S.W.3d 438, 443 (Tex. App.—Houston [14th Dist.] 2003, no pet.). And under the UCC, a final payment to an authorized agent is deemed payment to the principal. *Id.*; *see Metro. Ins. & Annuity Co. v. Peachtree Settlement Funding, LLC*, 500 S.W.3d 5, 17 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *Jarvis*, 390 S.W.3d at 640). This is true even if the agent misappropriates the money. *Jarvis*, 390 S.W.3d at 640. Under such circumstances, the principal bears the loss because, as the party who trusted the wrongdoer, the principal was in the best position to avoid the loss. *Gusma Props., L.P. v. Travelers Lloyds Ins. Co.*, 514 S.W.3d 319, 323 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Circumstantial evidence can establish an agency relationship and determine the scope of the agent's authority, but the question of agency is usually one of fact. *Jarvis*, 390 S.W.3d at 639, 641; *Aquaduct, L.L.C.*, 116 S.W.3d at 442. An agent cannot create the authority to bind the principal; actual or apparent authority is created only by the principal's words or conduct. *Coleman v. Otese Ltd.*, No. 02-19-00015-CV, 2020 WL 370577, at \*6 (Tex. App.—Fort Worth Jan. 23, 2020, no pet.) (mem. op.).

We have found two cases involving unfaithful loan servicers who misappropriated payoff funds. *See Jarvis*, 390 S.W.3d at 640; *Aquaduct, L.L.C.*, 116 S.W.3d at 443. In *Jarvis*, the debtor signed a note and deed of trust naming her lenders as beneficiaries "c/o" the loan servicer at whose office she made monthly payments. 390 S.W.3d at 635. When the debtor decided to sell the property, the loan

servicer provided the payoff amount and wiring instructions to its account to the buyer's title company. *Id.* at 635–36. The loan servicer received the loan payoff funds but did not disburse them to the lenders; instead, it sent the lenders monthly checks purporting to be note payments and then stopped making those payments. *Id.* When the lenders learned a year later that the property had been sold, they informed the loan servicer that it was "no longer authorized to act as a servicing agent on [their] behalf." *Id.*

At trial, the lenders denied that they had given the loan servicer the authority to accept loan payoffs on their behalf. *Id.* at 640. Other evidence, however, showed that of the lenders' ten loans with this particular loan servicer, three—including the one at issue—had been paid off, and in the first two, the loan servicer had received the payoff funds and then disbursed the funds to the lenders, who did not assert either time that the loan servicer had lacked authority to receive the funds on their behalf. *Id.* at 637, 641. The trial court found—and the appellate court agreed that more than a scintilla of evidence supported—that through the lenders' and loan servicer's course of conduct, they had established a usual, customary, and authorized procedure by which the loan servicer directly received payoff funds and then disbursed them to the lenders and that the loan servicer had the implied actual authority to accept and receive the loan payoff on the note at issue on the lenders' behalf. *Id.* at 637, 640–41. When the title company forwarded the loan-payoff funds to the loan servicer, the

lenders' agent with authority to accept the funds, "the lien on the property was extinguished and the [deed of trust] was discharged." *Id.* at 642.

Likewise, in *Aquaduct*, when a loan servicer converted a note's payoff amount during a loan refinance, the trial court found—and the appellate court agreed—that the evidence sufficed to show that the loan servicer had implied actual authority to accept full payment of the note on the lienholder's behalf. 116 S.W.3d at 442–43. When the lienholder had acquired the note and deed of trust, it failed to make a written agreement defining the scope of the loan servicer's authority, and the lienholder's president testified that the loan servicer had had the authority, among other things, to conduct the day-to-day business of handling the notes and to issue payoff statements. *Id.* at 442. The loan servicer's letter to the lienholder's newly acquired debtors merely informed them that servicing of the note had been transferred to it and directed them to send their payments to it; the letter did not mention the new lienholder's name, and the new lienholder never had any communication with its debtors. *Id.* The lienholder did not tell its loan servicer that it could not accept full payments of notes until two years after the loan servicer had accepted the full payoff at issue in the case. *Id.* at 442–43.

Here, although NBT argues that BEDC provided no evidence to show that Campbell had a right to enforce the K&M note even before he assigned the note and liens to Pinnacle, the K&M note's terms require payment to "Lender," who was identified in the note as Campbell, at his address "or any other place that Lender may

designate in writing," and the deed of trust defined "Lender" to include "any mortgage servicer for Lender." There is no evidence that Pinnacle, or NBT upon its acquiring the note and deed of trust, instructed K&M Collision to stop making note payments to Campbell and instead to make payments to Pinnacle and, later, to NBT.

To the contrary, the summary-judgment evidence tends to show that K&M Collision's owners were still making payments to Campbell in May and June 2016, when Campbell gave Republic Title payoff information for the K&M note, and no record evidence shows that K&M Collision's owners were ever notified to pay anyone else. *See* Tex. Prop. Code Ann. § 12.017(a)(3) (defining "mortgage servicer" as the last person to whom a mortgagor has been instructed by a mortgagee to send payments for a loan secured by a mortgage), § 51.0001(3) (same). Accordingly, a genuine issue of material fact remains concerning Campbell's status as NBT's loan servicer and payoff agent. If, as this record implies and as viewed in the light most favorable to BEDC as the nonmovant, Campbell had authority to accept the payoff—as he had been accepting K&M Collision's monthly payments—then Republic Title's payment discharged NBT's lien and BEDC took the property free of NBT's interest, even though Campbell continued to use the no-longer-valid liens to secure a loan extension from NBT. *See* Tex. Bus. & Com. Code Ann. § 3.602 (explaining that an instrument is considered paid to the extent payment is made by or on behalf of the party obliged to pay it and to a person entitled to enforce it or to a person formerly entitled to enforce it if, at the time of payment, the obligor has not received adequate notification that the

30

note has been transferred and that payment is to be made to the transferee); *see also id.* § 9.308 cmt. 6 (explaining that attachment and perfection of a security interest in a secured right to payment do not of themselves affect the obligation to pay and that UCC Chapter 9 does not determine who has the power to release a mortgage of record, which is determined by real-property law).

Because there remains a genuine issue of material fact regarding the status of the lien, the trial court erred by granting a summary judgment of judicial foreclosure in NBT's favor. *See De La Garza*, 2018 WL 5725250, at *7. We sustain this portion of BEDC's sole issue.

## V. Conclusion

Having sustained the dispositive portion of BEDC's sole issue, we reverse the trial court's judgment and remand the case for further proceedings.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: April 7, 2022